Cory ZIOLKOWSKI, Appellant

v.

The STATE of Texas, Appellee.

No. 06–06–00030–CR.

Court of Appeals of Texas,
Texarkana.

Submitted March 7, 2007.

Decided April 3, 2007.

Troy Hornsby, Miller, James, Miller & Hornsby, LLP, Texarkana, for appellant.

Nicole Habersang, Assistant District Atty., Texarkana, for appellee.

Before MORRISS, C.J., CARTER and MOSELEY, JJ.

## OPINION

Opinion by Justice CARTER.

Cory Ziolkowski appeals his conviction for murdering James "Bucky" Ball. Ziolkowski was convicted by a Bowie County jury for causing the death of Ball, who was shot while tied to a chair on November 3, 2003, in Texarkana, Texas. The jury recommended a sentence of fifty years, and Ziolkowski was sentenced accordingly.

We affirm the trial court's judgment of conviction and sentence after finding: 1) although there was an abuse of discretion, Ziolkowski did not suffer harm when the trial court ordered him to wear ankle shackles through trial; 2) the evidence is legally sufficient; 3) the evidence is factually sufficient; and 4) there was no error in the trial court's exclusion of portions of Ziolkowski's statements to the police.

### Ankle Shackles During Trial

After voir dire, and out of the presence of the jury, Ziolkowski's trial counsel lodged an objection to the fact Ziolkowski had been required to wear ankle shackles during jury selection.[1] On appeal, Ziolkowski contends that there was insufficient cause for the trial court's shackling order and that Ziolkowski suffered reversible

harm. Although we find the trial court abused its discretion in ordering Ziolkowski to wear ankle shackles, we overrule this point of error as we find no evidence of harm to Ziolkowski.

When a defendant is viewed by the jury in handcuffs or shackles, his or her presumption of innocence is seriously infringed. *Long v. State*, 823 S.W.2d 259, 282 (Tex.Crim.App.1991). Only in rare circumstances is shackling called for, and in such event, the record must detail the grounds for such action. *Id.; Marquez v. State*, 725 S.W.2d 217, 229 (Tex.Crim.App. 1987). The trial court must set forth with specificity the reasons supporting its decision to restrain the defendant. *Cooks v. State*, 844 S.W.2d 697, 722 (Tex.Crim.App. 1992) (citing *Long*, 823 S.W.2d at 282; *Marquez*, 725 S.W.2d at 228). On appeal, the role of an appellate court is to determine whether the trial court abused its discretion in authorizing the restraint. *Long*, 823 S.W.2d at 282. Even if an abuse of discretion exists, reversal may not be called for if such abuse was harmless. *Canales v. State*, 98 S.W.3d 690, 697–98 (Tex. Crim.App.2003); *Cooks*, 844 S.W.2d at 723; *Long*, 823 S.W.2d at 283. In *Canales*, *Cooks*, and *Long*, the Texas Court of Criminal Appeals held that, where the record did not affirmatively show that the jury had seen the defendant's ankle shackles, the appellant could not demonstrate harm. In *Long*, the court found that the trial court's order that the defendant be shackled did not have adequate support in the record and found that the trial court's decision was thus an abuse of discretion. *Long*, 823 S.W.2d at 283. However, as in *Canales*, any error was harmless error.

The Texas Court of Criminal Appeals has long recognized the danger of allowing

---

1. There is a brief mention in the record of this topic, and apparently the trial court's deci- sion, being made before voir dire, in chambers.

an accused to be seen shackled by the jury. "We desire to make it perfectly plain that we regard a trial with the prisoner in irons as obnoxious to the spirit of our laws and all ideas of justice, and it is only when the record brings the case clearly within one of the rare exceptions that we would consent for a conviction to stand. Before a judge should permit a case to proceed under such circumstances, he should be very sure of his ground." *Gray v. State,* 99 Tex.Crim. 305, 268 S.W. 941, 950 (1924) (op. on reh'g). The *Gray* court described such "rare exceptions" as circumstances where "in the sound discretion of the [trial] court, it appears necessary to retain [the accused's] shackles to prevent the escape or self-destruction of the prisoner, or to prevent him from injuring bystanders or officers of the court, or if necessary to maintain a quiet and peaceable trial, the court may try the prisoner without having the shackles removed; his action being subject to the closest scrutiny and review by the appellate court." *Id.* at 949.

■ For example, where the defendant had previously been convicted of capital murder, had carried deadly weapons in prison, choked and stabbed fellow inmates, attacked and spit on cameramen, and threatened to run and cause police officers to have to shoot and kill him, it was found the trial court had not abused its discretion when it ordered the defendant shackled during the punishment phase of trial. *Marquez,* 725 S.W.2d at 228–30. Likewise, where a defendant had a history of escapes and had expressed his wish to die rather than face imprisonment, the Texas Court of Criminal Appeals found the trial court had not abused its discretion in ordering the defendant to wear leg restraints

in trial. *Jacobs v. State,* 787 S.W.2d 397, 407 (Tex.Crim.App.1990). Where the trial court fails to make specific findings on the need for restraints, that court abuses its discretion. *Simms v. State,* 127 S.W.3d 924, 928 (Tex.App.-Corpus Christi 2004, pet. ref'd); *Cox v. State,* 931 S.W.2d 349, 352 (Tex.App.-Fort Worth 1996), *pet. dism'd, improvidently granted,* 951 S.W.2d 5 (Tex.Crim.App.1997).[2]

■ In the instant case, the trial court ordered Ziolkowski to wear ankle restraints during trial out of concern for "courtroom security, [and] the seriousness of the offense." The use of restraints, such as shackles, cannot be justified based on a general appeal to the need for courtroom security or simple reference to the severity of the charged offense. *Wynn v. State,* No. 01–05–00767–CR, 2006 WL 3230284, 2006 Tex.App. LEXIS 9711 (Tex. App.-Houston [1st Dist.] Nov. 9, 2006, no pet.) (citing *Long,* 823 S.W.2d at 283; *Jacobs,* 787 S.W.2d at 407). If the trial court determines the defendant should be shackled during trial, the trial court must specify the reasons for restraining the defendant. *Cooks,* 844 S.W.2d at 722. Additionally, all efforts must be made to ensure the jury does not view the defendant in shackles. *Long,* 823 S.W.2d at 282.

Here, the trial court's statement that Ziolkowski would be shackled out of concern for courtroom security and because Ziolkowski was on trial for murder are not specific reasons as required by caselaw. However, the trial court did take specific preventive measures to keep the jury from observing the shackles. The trial court commented that Ziolkowski had only ankle shackles and that Ziolkowski was not required to stand, in order to "eliminate any

---

2. *See also Brown v. State,* 877 S.W.2d 869, 871 (Tex.App.-San Antonio 1994, no pet.) (generalized concerns about nature of defen-dant's prior sentences insufficient to support restraint).

possibility" the jury might observe the shackles. The court ordered that Ziolkowski would be seated at the counsel table before the jury was brought into the courtroom and that the jury would be removed before Ziolkowski was moved. If Ziolkowski testified, the court would "take steps to insure that the jury is not present at the time he is seated or taken back to counsel table."

The trial court gave explicit instructions and made accommodations to ensure Ziolkowski's ankle shackles would not be observed. *Cf. Hughes v. State*, 962 S.W.2d 689, 692 (Tex.App.-Houston [1st Dist.] 1998, pet. ref'd) (detailing several acts of trial court, such as sitting in various seats in the courtroom, moving counsel tables, and having partitions to block view of defendant's feet to ensure jurors would not see shackles).

 This Court is quite aware of the potential for tragic violence in our society's halls of justice.[3] We do not intend to supplant the trial court's discretion in controlling the courtroom and ensuring the safety of the litigants, participants, and witnesses in attendance.[4] While the trial court erred in ordering Ziolkowski shack-

led without more explanation than concern for the security of the courtroom and the fact Ziolkowski was charged with murder, since the trial court took steps to "eliminate any possibility" of the jury observing the shackles, we will review the error for harm.

Improperly ordering a defendant shackled during trial raises a question of the defendant's presumption of innocence. Where an error has constitutional implications, this Court must reverse unless we determine, beyond a reasonable doubt, that the error did not contribute to Ziolkowski's conviction. *See* Tex.R.App. P. 44.2(a). The three ways appellate courts have identified harm to a defendant who is restrained during trial are: (1) prejudice felt by jurors who conclude that, because a defendant is shackled, the court has already decided that he or she is guilty, dangerous, and untrustworthy, (2) a restraint may interfere with the defendant's mental faculties and ability to communicate with counsel during trial, and (3) restraints are an affront to a court and its proceedings. *Cox*, 931 S.W.2d at 353.

Here, there is no evidence jurors ever saw Ziolkowski's shackles, and thus no evi-

---

**3.** On July 1, 1992, a gunman opened fire in the courtroom of the Fort Worth Court of Appeals, killing one prosecutor and another attorney, and wounding at least two others, including a former law clerk to this Court. *See Davis v. State*, 890 S.W.2d 489, 491 n. 1 (Tex.App.-Eastland 1994, no pet.) ("On July 1, 1992, George Lott shot and killed two people and wounded three others in the courtroom of the Fort Worth Court of Appeals."). An article in the *USA Today* newspaper details a shooting in an Atlanta, Georgia, courtroom killing four persons, including the judge, and chronicles other courtroom tragedies. Larry Copeland, *I Could Tell He Was Going to Shoot Everybody*," USA Today, March 13, 2005 (internet at http://www.usatoday.com/news/nation/2005–03–13–ga–courthouse—x.htm). A study by the Utah Bar found that, "Although it seems hard to believe, the court-

room is one of the most dangerous places for lawyers." Stephen Kelson, *An Increasingly Violent Profession*, 14 Utah Bar J. 8 (Mar. 2001).

**4.** *See Deck v. Missouri*, 544 U.S. 622, 632, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005): "We do not underestimate the need to restrain dangerous defendants to prevent courtroom attacks, or the need to give trial courts latitude in making individualized security determinations. We are mindful of the tragedy that can result if judges are not able to protect themselves and their courtrooms. But given their prejudicial effect, due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case."

dence the jury took the shackles to be a comment by the trial court on Ziolkowski's guilt, danger, or trustworthiness. Nor is there any evidence or argument Ziolkowski was hampered in his ability to communicate with his trial attorney. As we have explained above, we find the trial court appeared to take measures to prevent an offense to the dignity and decorum of the courtroom proceedings. Finally, absent any evidence the jury actually saw the shackles, we conclude, beyond a reasonable doubt, that Ziolkowski did not suffer harm. *See Canales,* 98 S.W.3d at 697–98; *Cooks,* 844 S.W.2d at 723; *Long,* 823 S.W.2d at 283.

We overrule Ziolkowski's first point of error.[5]

In separate points of error, Ziolkowski claims the evidence is legally and factually insufficient to support the jury's verdict.

### Legal Sufficiency

In our review of the legal sufficiency of the evidence, we employ the standards set forth in *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This calls on the reviewing court to view the relevant evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Johnson v. State,* 23 S.W.3d 1, 7 (Tex.Crim.App. 2000). In our review, we must evaluate all the evidence in the record, both direct and circumstantial, whether admissible or inadmissible. *Dewberry v. State,* 4 S.W.3d 735, 740 (Tex.Crim.App.1999).

### Factual Sufficiency

In a factual sufficiency review, we view all the evidence in a neutral light and determine whether the evidence supporting the verdict is so weak that the fact-finder's verdict is clearly wrong and manifestly unjust or whether the great weight and preponderance of the evidence is contrary to the verdict. *Watson v. State,* 204 S.W.3d 404, 417 (Tex.Crim.App.2006); *see also Johnson,* 23 S.W.3d at 7; *Clewis v. State,* 922 S.W.2d 126, 134 (Tex.Crim.App. 1996). It is the fact-finder's role to judge the credibility of the witnesses and the weight to be given their testimony, and the fact-finder "may resolve or reconcile conflicts in the testimony, accepting or rejecting such portions thereof as it sees fit." *Banks v. State,* 510 S.W.2d 592 (Tex.Crim. App.1974); *see also Scott v. State,* 814 S.W.2d 517, 518–19 (Tex.App.-Houston [14th Dist.] 1991, pet. ref'd). When evidence both supports and conflicts with the verdict, we must assume that the fact-finder resolved the conflict in favor of the verdict. *Turro v. State,* 867 S.W.2d 43, 47 (Tex.Crim.App.1993); *see also Marshall v. State,* 210 S.W.3d 618, 625, 2006 Tex.Crim. App. LEXIS 2444, at *15 (Tex.Crim.App. Dec. 20, 2006) ("our factual-sufficiency jurisprudence still requires an appellate court to afford 'due deference' to the jury's determinations"). The appellate court's role is not to "find" facts; rather, it is to determine whether the verdict is against the great weight of the evidence presented at trial so as to be clearly wrong and unjust. *Ballard v. State,* 161 S.W.3d 269, 277 (Tex.App.-Texarkana 2005), *aff'd,* 193 S.W.3d 916 (Tex.Crim.App.2006) (Cochran, J., concurring) ("trial court, acting as finder of fact in the face of conflicting evidence, was authorized to believe or disbelieve any portion of the evidence").

---

5. We note that any time a trial court authorizes shackles, there is a risk the jury might observe them during the trial. If there is any evidence jurors actually observed the shackles, it would be difficult, if not impossible, to find the error harmless. Of course, it is not error in those "rare" cases when good and valid reasons justify shackling and the trial court states the reasons on the record.

### The Evidence

■ James "Bucky" Ball was shot, apparently while tied in a chair with an electrical cord, in the house he shared with appellant, Cory Ziolkowski. Ball had been living with Ziolkowski for approximately two months before Sunday, November 3, 2003. On that date, Ball, Ziolkowski, Craig Rains, and Kim Houff were at the Ziolkowski house. Early in the afternoon, Rains borrowed Ziolkowski's car, and he and Houff went on an errand. Before they left, Ziolkowski said to Rains, who had known Ball since childhood, "I'm going to take care of Bucky, you want to help?" Rains testified he thought Ziolkowski meant he was going to tell Ball that he had to move out of the house. While Rains and Houff ran their errand, Rains received a telephone call from Ziolkowski, who said, "[I]t was done." At that point, Rains understood what Ziolkowski meant when he said he was going to "take care of" Ball. While on the errand with Rains, Houff received a call from Ball asking her to bring him some cigarettes and a Coke. After Rains received the call from Ziolkowski stating, "[I]t was done," he told Houff that Ball would not need the cigarettes and Coke. Houff also testified she had been told Ball was "fixing to be killed." When Rains and Houff returned to the house, Rains gave Ziolkowski his car keys. Ziolkowski then said to Rains, "[N]ow who lacks the courage of their convictions?" Rains said this was in reference to something Ball had said to Ziolkowski before, when Ziolkowski would "talk about being this hit man or . . . trying to be a little bad ass." Rains and Houff got on Rains' motorcycle and left.

Ziolkowski's neighbor Greg Oliver testified that, on the day of the shooting, he saw Ziolkowski, who showed him two pistols, one chrome with a black handle and the other solid black, and asked Oliver if he wanted to buy them. Oliver declined. Later that day, Oliver heard five shots while he was standing outside. He saw two white men run out of the front door of Ziolkowski's house. One got in the driver's side of a white pickup; the other went to look around the corner of the house, then got in the passenger's side, and they sped off. Ziolkowski then came running out and looked "puzzled." Ziolkowski asked Oliver what was going on, and if Oliver had shot off fireworks. Ziolkowski did not have a shirt on, and had a slight mark on his chest. According to Oliver, Ziolkowski stuck his hands out to show Oliver, and said "nothing happened, nothing; I didn't do anything." Ziolkowski then went to his porch and sat, playing the guitar.

Ziolkowski testified he was in a workshop in the back yard working on a motorcycle when he heard shots. Ziolkowski said he went around the house, saw Oliver, and started talking with him about the shots. Then Ziolkowski saw Robert and Brian Rhea come out of Ziolkowski's house and leave. According to Ziolkowski, he went in the house and found Ball, dead in a chair. The first thing he thought of was getting rid of the body. Later that day, Sergeant David Biggars arrived at Ziolkowski's house to investigate reports of shots being fired and of a white man without a shirt waving a pistol around or having a gun tucked in his waistband. Biggars knocked three times before Ziolkowski answered the door. When Biggars asked about the mark on Ziolkowski's chest, he said his pet wolf had scratched him. Biggars testified that explanation did not seem consistent with the nature of the wound, and Ziolkowski seemed nervous or fidgety. Ziolkowski gave the officers permission to look around the house. The officers thought the house was very messy (one officer described it as "nasty . . . what we would refer to . . . as a crack

house or a drug house"), and thought it odd that one bedroom was very clean, comparatively. The officers also smelled bleach. While one officer stayed with Ziolkowski on the front porch, Biggars went to the back yard, where he saw a black car backed up to the back door and where he found Ball's body, wrapped in a tent, with a chair laying over it. When Biggars asked, "[I]s he dead?" Ziolkowski said, "I didn't do it."

Ziolkowski's sister and brother-in-law owned a home in Texarkana, Arkansas, and had recently moved to El Dorado, Arkansas. Ziolkowski was asked by his sister if he would take care of their animals at their house in Texarkana, Arkansas, and was given a key to the house. In the course of the investigation, Ziolkowski directed officers to that house. In a baby's cradle at the house, police found two pistols in a shaving kit bag. Ziolkowski's brother-in-law, Chris Cameron, identified one of those guns, a Colt .45, as his. That gun was used to shoot Ball. Detective Chris Lee testified Robert Rhea, in a statement, admitted pulling the trigger and killing Ball.[6] Lee also said Rhea's whereabouts was unknown.

Robert Rhea's brother, Brian, testified he was with Robert at Ziolkowski's house on the day of the killing. Ziolkowski and Robert were talking, but Brian said he could not hear the conversation. He heard shots while he was in the back yard. Robert and Ziolkowski then came around the house; Robert got in the truck, and the two Rheas went to Brian's house. Brian testified he was pretty convinced Robert had just killed Ball, and the two brothers had a fight over whether Robert should leave Brian's house. Brian said he did not know where Robert was and had not been in contact with him for about eight months.

Based on the above evidence, we find that a rational jury could have found that Ziolkowski, acting with intent to promote or assist the offense, solicited, encouraged, directed, aided, or attempted to aid another person in committing the offense of murder.[7] Salient facts for the jury to consider included:

1. The murder weapon was owned by Ziolkowski's brother-in-law, and only Ziolkowski had a key to the home where it was located.

2. Ziolkowski had two pistols in his possession on the day of the murder.

3. Ziolkowski directed the police to the location of the murder weapon.

4. Ziolkowski told Rains he was going to "take care of Bucky" and asked Rains if he wanted to help.

5. Ziolkowski told Rains afterward that "[I]t was done" and he showed that he had the "courage of his convictions."

6. Ziolkowski's home was cleaned only at the murder site.

7. Police were never called to the scene by Ziolkowski, but appeared in response to another report of shooting at the home.

8. At the time of police intervention, they discovered Ball's body that Ziolkowski was attempting to conceal and dispose of.

From these facts, a rational jury could conclude that Ziolkowski was guilty of the offense of murder as a party to the offense.

In conducting a factual sufficiency review, we review the evidence in a neutral light. Ziolkowski presented evidence that

---

6. The record is not clear on how or whether Rhea was in custody, and if so, how he had disappeared.

7. The jury charge included an instruction on the law of parties.

Ball had stolen his brother-in-law's pistol from the home while they both were at the home. He also testified he was outside of the home when the shooting occurred. The evidence further shows that at least one other individual participated in this offense. However, even when viewed in a neutral light, we cannot say the evidence presented to the jury is so weak that the verdict is clearly wrong and manifestly unjust; nor is the great weight and preponderance of the evidence contrary to the verdict. Therefore, we find the evidence to be factually sufficient. We overrule Ziolkowski's second and third points of error.

### Ziolkowski's Statements and the Rule of Optional Completeness

■ At trial, the State sought to introduce statements made by Ziolkowski to police in the hours after his arrest. Ziolkowski made three separate written statements to the police. The State offered a portion of the second statement in which Ziolkowski acknowledged his possession of two pistols, including the murder weapon, on the day of the murder, which he showed to his neighbor. The State also offered a portion of the third statement in which Ziolkowski stated the gun used to shoot Ball belonged to his brother-in-law and was a chrome and black Colt .45, and acknowledged hiding the pistol in his brother-in-law's vacant house. As a result of this statement, the police retrieved the murder weapon from his sister and brother-in-law's home. Ziolkowski sought to introduce the first and second statements in their entirety and the omitted sentence in the third statement under the provisions of evidentiary Rules 106 and 107. *See* Tex.R. Evid. 106, 107. The trial court denied these requests. On appeal, Ziolkowski claims error in the trial court's ruling.

Even though the State did not offer any of the first statement, Ziolkowski sought to introduce the entirety of the first statement given at 11:55 p.m. on November 2, 2003. In this statement, Ziolkowski discussed that Ball had lived with him for three and a half months and that he and Ball kicked Ball's girlfriend out of the house that morning. Further, it is stated that Ziolkowski was outside working on a motorcycle when he heard shots; he saw Rhea run out of the house, and Rhea threatened Ziolkowski and his girlfriend if Ziolkowski reported the killing to the police; Ziolkowski then decided the best thing to do was to get Ball's body out of the house and described the steps he set about to do the same, and then the police arrived.

In the second statement, given at 2:15 a.m. on November 3, the State offered only the first paragraph describing how Ziolkowski was outside with two pistols, which Ziolkowski said his neighbor Greg Oliver wanted to buy. In the rest of this second statement, Ziolkowski says he panicked when he came in the house and saw that Ball had been shot, and Ziolkowski describes actions he took to move the body.

The third statement which was introduced by the State, except for the one sentence (all three statements were given to different police officers), discusses an injury to Ball's neck and how Ziolkowski put the guns in a shaving bag, then took the bag to his brother-in-law's house and put the bag, with the pistols, in a baby cradle. The trial court ordered redacted the following sentence in the third statement, "I was not in the house when Bubba [Rhea] shot Bucky [Ball] and did not tell him to shoot him."

■ The standard of review for a trial court's ruling under the Texas Rules of Evidence is abuse of discretion. *Angleton v. State*, 971 S.W.2d 65, 67 (Tex.Crim.App. 1998). If the ruling was correct on any theory of law applicable to the case, in

light of what was before the trial court at the time the ruling was made, then we must uphold the judgment. *State v. Ross*, 32 S.W.3d 853, 856 (Tex.Crim.App.2000); *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App.2000).

Rule 106 of the Texas Rules of Evidence, "Remainder of or Related Writings or Recorded Statements," allows an adverse party to introduce any other part of a writing or recorded statement "which ought in fairness to be considered contemporaneously with it." Tex.R. Evid. 106.[8] Rule 107 of the Texas Rules of Evidence, "Rule of Optional Completeness" states:

> When part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the other, and any other act, declaration, writing or recorded statement which is necessary to make it fully understood or to explain the same may also be given in evidence, as when a letter is read, all letters on the same subject between the same parties may be given.

Tex.R. Evid. 107.

Ziolkowski asserts on appeal that, by failing to allow the complete text of all three statements to be admitted into evidence, the jury was at risk of hearing an incomplete version of events surrounding the shooting of Ball. The portions offered by the State showed Ziolkowski in possession of two pistols, including the murder weapon, on the day Ball was killed. The trial court found the statements to be three separate statements which were not on the same subject as the portions of the statements introduced by the State.

Rule 107 allows introduction of any statement or writing "on the same subject" as the introduced evidence "necessary to make it fully understood. . . ." Tex.R. Evid. 107.

The Texas Court of Criminal Appeals has explained that the purpose of this provision is to reduce the possibility of the fact-finder receiving a false impression from hearing the evidence of only a part of the conversation, writing, act, or declaration. The theory behind the rule is that, by allowing the jury to hear the rest of the conversation on the same subject, the whole picture will be filled out, removing any misleading effect which may have occurred from the introduction of only a portion of the conversation. Obviously, this purpose is achieved by receipt of the balance of the conversation on the same subject. But to permit under this rule the introduction of other portions of such a conversation wholly unrelated to the matter initially presented cannot contribute to achievement of the purpose of the rule. Consequently, it is improper to rely on this rule as authority for the introduction of such unrelated portions. *Roman v. State*, 503 S.W.2d 252, 253 (Tex.Crim.App.1974). "The plain language of Rule 107 indicates that in order to be admitted under the rule, the omitted portion of the statement must be 'on the same subject' and must be 'necessary to make it fully understood.' "

---

8. Rule 106 has been described as merely a rule of timing applying only to writings and recorded statements. When one party has presented a part of a statement, the other party may, at that time, introduce another part which ought in fairness to be considered contemporaneously. "Rule 106 is an acceleration provision that applies to a subset of the evidence that is accorded admissibility under the broader 'door-opening' doctrine codified in Rule 107." 1 Steven Goode et al., Texas Practice: Guide to the Texas Rules of Evidence § 106.1 (2002). The issue here is the admissibility of Ziolkowski's offer, not the timing of its introduction. Therefore, we will examine Rule 107 to determine the admissibility of Ziolkowski's offer.

*Sauceda v. State*, 129 S.W.3d 116, 123 (Tex.Crim.App.2004);[9] *see also Roman*, 503 S.W.2d at 254 (disapproving language in earlier cases which interpreted former Texas Code of Criminal Procedure Article 38.34, predecessor to the current rule 107, that, when one party introduces any part of a statement, the other party is entitled to introduce the entire statement as "overly broad." Such a reading "is not supported by the language of the statute and should not be relied upon in the future."). *Sauceda*, 129 S.W.3d at 123; *Roman*, 503 S.W.2d at 254.

■ The portions of the statements introduced by the State all related to the subject of Ziolkowski's possession of the murder weapon both before and after the homicide occurred. Statements Ziolkowski offered were his versions of events of the day of the homicide giving his self-serving statements that Rhea acted alone in killing Ball and that Ziolkowski had no idea about the crime or of Rhea's intents. "[S]elf-serving declarations of the accused are ordinarily inadmissible in his behalf, unless they come under some exception, such as: being part of the res gestae of the offense or arrest, or part of the statement or conversation previously proved by the State, or being necessary to explain or contradict acts or declarations first offered by the State." *Singletary v. State*, 509 S.W.2d 572, 576 (Tex.Crim.App.1974).

Here, there is no contention that Ziolkowski's statements were part of the res gestae of the offense: they were made several hours after his arrest. *See Spruill v. State*, 624 S.W.2d 779, 782 (Tex.App.-Fort Worth 1981, no pet.) (self-serving statement which the defendant tried to adduce at trial was not res gestae, but rather was made a considerable length of time after the shooting when things had calmed down and after defendant had ample time to consider and calmly reflect on what had happened).

■ Nor were they needed to explain or contradict the portions offered by the State, that Ziolkowski was in possession of the murder weapon on the day of the killing and that he hid it and another pistol after the killing. "Rule 107 is designed to guard against the possibility of confusion, distortion, or false impression that could be created when only a portion of evidence is introduced." *Crosby v. Minyard Food Stores, Inc.*, 122 S.W.3d 899, 903 (Tex. App.-Dallas 2003, no pet.) (citations omitted). "The so-called rule of optional completeness takes effect when other evidence has already been introduced but is incomplete and misleading." *Jones v. State*, 963 S.W.2d 177, 182 (Tex.App.-Fort Worth 1998, pet. ref'd). Here, there was no showing that the entirety of the three statements were either on the same subject or necessary to correct a false or incorrect impression of the evidence.

The trial court did not err in exercising its ruling that Ziolkowski was not entitled to introduce the remainder of the written statements. We find no error and overrule Ziolkowski's fourth point of error.

9. In *Sauceda*, the defendant sought to offer a Child Protective Services caseworker's testimony to impeach the child complainant, who had said the defendant threatened her with weapons. The defendant proffered evidence that the caseworker would testify that the child had made no mention of weapons in the interview. The State then said it would be entitled to offer the entire videotaped interview, which contained extraneous offenses. The trial court agreed. The defendant then chose not to call the caseworker. The Texas Court of Criminal Appeals held it was error to rule the State could have introduced the entire videotape; the defendant could have called the caseworker to testify that the child had not mentioned weapons without the necessity of playing the full videotape. *Sauceda*, 129 S.W.3d at 118–19.

We affirm the judgment of the trial court.