Number 13-06-00464-CR


COURT OF APPEALS


THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


JOE DAVID PADRON, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 214th District Court 

of Nueces County, Texas

 


MEMORANDUM OPINION


Before Justices Rodriguez, Garza, and Vela


Memorandum Opinion by Justice Vela
 


 Appellant, Joe David Padron, and his codefendant, Martin Robles, (1) were accused
of entering a home and shooting and killing Jesus Gonzalez and John Commisky. A jury
convicted Padron of three counts of capital murder. (2) Because the jury rejected the death
penalty, Padron received life imprisonment for each count. (3) In five issues, Padron
contends the trial court erred by denying his motions for a mistrial, admitting two
photographs into evidence, overruling his objection to the prosecutor's comments
concerning his failure to testify, and denying his motion for new trial. We affirm.

I. Factual Background


 Padron does not challenge the legal or factual sufficiency of the evidence to sustain
his convictions. We shall, however, review the applicable facts because they are pertinent
to the issues raised.

A. State's Evidence

 John Commisky, Jesus Gonzalez, Gavino Moreno, and Tony Ortiz sold crack
cocaine out of a home on Mary Street in Corpus Christi. Because the Raza Unida ("RU")
gang had a heavy presence in the neighborhood, the men were supposed to, but did not,
pay RU a percentage of the money they earned from selling cocaine out of the home. 
Moreno testified that "[i]f you don't pay a percentage, then they [RU] deal with you."

 In the early morning of November 12, 2002, Moreno was inside the Mary Street
home when he looked outside and saw a man standing in the driveway wearing a ski mask. 
He saw a second man, also wearing a ski mask, jump over the fence in front of the house. 
Moreno ran out the back door. At this time, Ortiz was asleep in the house when he heard
gunshots. He saw two masked men standing in the back room of the house. One was
shooting an AK-47, and the other was shooting a nine millimeter handgun. Commisky and
Gonzalez died inside the home from multiple gunshot wounds.

 When the shooting stopped, Ortiz looked out the window and saw appellant Padron
and another man getting into an SUV (4). When the prosecutor asked Ortiz, "How could you
tell that it was this Defendant [Padron] that you saw going into the SUV?", he replied: 
"'[c]ause he took his--they were taking the mask off, and the light turned on from the SUV,
the dome light." Prior to the shooting, Ortiz had seen Padron "a few times." Ortiz testified
that Padron was one of the shooters inside the house and that Padron had fired the nine
millimeter handgun.

 The State called two witnesses, Robert Lara and Vino Garcia, both of whom testified
that they were incarcerated in the Nueces County Jail along with Robles and Padron. 
Garcia testified that he overheard Robles and Padron discussing the murders of Commisky
and Gonzalez. With respect to this conversation, the prosecutor asked Garcia:

 Q. [D]id either Mr. Robles or Mr. Padron discuss what type of weapons
were used or who shot first or second or anything like that?


 A. Well, sir, Kid [Robles]--Kid told Magic [Padron], "You ain't no killer,"
. . . Magic goes, "If I ain't no killer I shot right after you. How you
gonna say I didn't do nothing?". . . .


 Q. So, Magic [Padron] told Kid [Robles] "I shot right after you."


 A. Yes, sir.


 With respect to Robert Lara, the prosecutor asked him:


 Q. After Mr. Padron [appellant] was in your tank, did you ever hear any
conversations between Mr. Padron and Mr. [Martin] Robles?


 A. Yes, sir.


 Q. Did any of those conversations refer to the homicide of Commisky
and Gonzalez?


 A. Yes, sir.


 Q. Can you please tell me what you heard, . . . .


 * * *


 A. When Mr. Padron first came into 4A, he had told me why--he doesn't
know why they had got caught. There must be a snitch. Mr. Robles
then in a fit got into the conversation and said, "You might be the
snitch." Mr. Padron then started talking to Mr. Robles, "I don't
understand how we got caught. I don't understand." Mr. Robles-then
they started arguing. Mr. Padron told Mr. Robles, "If it wasn't for that
. . . fucking letter, we wouldn't have got caught."


 Q. What letter was that?


 A. A letter that Mr. Robles sent to 4A letting them know that the job was
done.


 * * *


 Q. What specifics, if any, did Mr. Padron go into with you regarding how
the offense was committed, sir?


 * * *


 A. He just said they came in through the unlocked gate, the chain was
around--the chain was just wrapped around the gate, no lock. It had
a lock but it was just unwrapped, the chain, walked in through the side
of the house, went around to the kitchen area where the light was
turned on. They just creeped in the house.


 Q. Did he tell you what happened from there?


 A. [S]o they went into the room and they just shot the Cuare (Commisky
and Gonzalez) boys. 


 Q. Did Mr. Padron mention what type of weapons were used?


 A. Just a high--high-caliber assault rifle and something about a large
caliber, something like that.

B. Appellant's Evidence

 Sara Cantu, the mother of Ortiz's children, testified that she had a "friendship"
relationship with Padron. She said that Padron and her sister, Jessica, were friends and
that Jessica was married to Gabriel Ramos, a member of the RU gang.

 George Bermudez, a Nueces County Sheriff's deputy, testified that he had "a bad
opinion" about Lara's truthfulness and honesty. He stated that he would not believe Lara
if Lara was testifying under oath. He also stated that Garcia was not truthful and honest
and was unworthy of belief if he testified under oath. On cross-examination, Bermudez
testified that he knew Lara gave information which led to the conviction of a fellow officer,
who was bringing contraband into the Nueces County Jail. When the prosecutor asked
Bermudez, "Are you glad that somebody believed Robert Lara so that dirty cop would
plead guilty?", he replied, "In that aspect, yeah."

 Officer Gregory Barron, a training officer at the Nueces County Jail, testified that in
his opinion, neither Lara nor Garcia were worthy of belief under oath. Daniel Lopez, a
Nueces County Sheriff's deputy, testified that he did not believe that either Garcia or Lara
were trustworthy and honest.

 Mario Bedia worked for the Nueces County Sheriff's Department and was assigned
to the Tri-County Narcotics Task Force. He testified that he had bought narcotics from
Ortiz and that Ortiz made a living selling drugs. When counsel asked Bedia, "Do you think,
from what you know of him, that he's the kind of person if he testified, you could believe
him under oath?", he replied, "No, sir."

C. State's Rebuttal

 The State called Francisco Cabrialez as its sole rebuttal witness. Cabrialez testified
that while he and Padron were inmates in the Nueces County Jail, he had a conversation
with Padron. When the prosecutor asked Cabrialez if he could tell the jury the context of
that conversation, he replied: "We were talking about our cases . . . . I was telling him
about my case, stuff that happened during my case, how they identified me and everything,
and he [Padron] just told me, "No pun intended, but I only unmasked myself one time, and
I won't make the same mistake again."

II. Evidence of Padron's Prior Felony Conviction


 In his first issue, Padron contends the trial court erred in denying his motion for a
mistrial because of the introduction of inadmissible evidence regarding his prior felony
conviction. During the State's direct examination of Garcia at the guilt-innocence stage,
Garcia testified that he had overheard a conversation between Padron and Martin Robles. 
Specifically, Garcia testified, "[a]nd Mr. Robles told Padron, 'You think you're a killer? You
ain't no killer,' just because of the last case he had." At this point, the prosecutor asked
Garcia:

 Q. Mr. Robles told Mr. Padron, "You ain't no" --


 A. Killer.


 Q. --"killer." What--what did he say about this offense?


 A. Well, he said -


 Q. [L]et's talk about Commisky and Gonzalez.

At this point, the trial court held a bench conference at which defense counsel told the trial
court that Padron had a prior conviction for manslaughter. Counsel asked the trial court
to instruct the jury to "disregard the last comment that this witness made" and asked for a
mistrial. The trial court instructed the jury to disregard the statement, but denied the
request for mistrial (5).

A. Standard of Review

 We review the denial of a motion for mistrial under an abuse of discretion standard. 
Hawkins v. State, 135 S.W.3d 72, 76-77 (Tex. Crim. App. 2004); Davis v. State, 177
S.W.3d 355, 363 (Tex. App.-Houston [1st Dist.] 2005, no pet.). Under this standard, an
appellate court must uphold the trial court's ruling as long as the ruling was within the zone
of reasonable disagreement. Wead v. State, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). 
A mistrial is a device used to halt trial proceedings when error is so prejudicial that
expenditure of further time and expense would be wasteful and futile. Wood v. State, 18
S.W.3d 642, 648 (Tex. Crim. App. 2000); Ladd v. State, 3 S.W.3d 547, 567 (Tex. Crim.
App. 1999). 

B. Prejudicial Testimony

 When objectionable testimony is elicited, inadvertently or deliberately, an appellate
court presumes a jury will follow instructions to disregard the evidence. Drake v. State, 123
S.W.3d 596, 604 (Tex. App.-Houston [14th Dist.] 2003, pet. ref'd); see also Gardner v.
State, 730 S.W.2d 675, 696 (Tex. Crim. App. 1987). Thus, a trial court's instruction to
disregard can cure any harm resulting from testimony referring to extraneous offenses
"unless it appears the evidence was so clearly calculated to inflame the minds of the jury
or is of such damning character as to suggest it would be impossible to remove the harmful
impression from the jury's mind." Drake, 123 S.W.3d at 604 (citing Kemp v. State, 846
S.W.2d 289, 308 (Tex. Crim. App. 1992)). Thus, a trial court properly exercises its
discretion to declare a mistrial when, due to the error, an impartial verdict cannot be
reached or a conviction would have to be reversed on appeal due to "an obvious
procedural error." Wood, 18 S.W.3d at 648. When, as here, the trial court instructs the
jury to disregard, but denies a defendant's motion for a mistrial, the issue is whether the
trial court abused its discretion in denying a mistrial. Hawkins, 135 S.W.3d at 77. In
determining whether the trial court abused its discretion in denying the mistrial, we balance
three factors: (1) the severity of the misconduct (prejudicial effect); (2) curative measures;
and (3) the certainty of conviction absent the misconduct. Id. at 75. Only in extreme
circumstances, when the prejudice is incurable or the comment is "so prejudicial that
expenditure of further time and expense would be wasteful and futile," will a mistrial be
required. Id. at 77.

C. Analysis

 In the complained-of statement, Garcia mentioned neither the details about
Padron's last case nor that it resulted in a conviction for any crime, including manslaughter. 
Thus, Garcia's comments had little, if any, prejudicial effect. Further, it is undisputed that
the trial court instructed the jury to disregard the comment. We ordinarily assume that an
instruction to disregard cures any harm flowing from the error. Martinez v. State, 17
S.W.3d 677, 691 (Tex. Crim. App. 2000). Beyond that general assumption, however, we
can say in this case that Garcia's comments were not so inflammatory that an instruction
to disregard could not have cured the error.

 Finally, the evidence showed that Padron, an RU member, had a motive to kill
Commisky and Gonzalez because they were involved in selling drugs in an RU
neighborhood and did not pay RU members a percentage of the money they earned from
the drug sales. Moments before the murders, Moreno saw two masked men outside the
house. Ortiz saw two masked men inside the house firing an AK-47 and a nine millimeter
handgun. Immediately after the shooting, Ortiz was able to identify Padron as one of the
men getting into the SUV because Padron was removing his mask, and the SUV's dome 
light was on. Garcia testified that Padron told Robles: "I shot right after you. How you
gonna say I didn't do nothing?" Padron told Lara that, "[T]hey just shot the Cuare boys,"
referring to Commisky and Gonzalez. Padron told Francisco Cabrialez, "I only unmasked
myself one time, and I won't make the same mistake again." Even though the defense
attacked the credibility of the State's witnesses, the jury was free to believe or disbelieve
their testimony. Thus, absent Garcia's comment, the certainty of conviction is strong.

 After balancing the three Hawkins factors, we hold that any possible harm caused
by Garcia's testimony was cured by the trial court's instruction and that the trial court did
not err by denying counsel's motion for mistrial. See Drake, 123 S.W.3d at 603-04 (holding
that jury could follow instruction to disregard State's reference to defendant's "many
burglaries"); Ladd, 3 S.W.3d at 567 (grant of a mistrial is required only "when error is so
prejudicial that expenditure of further time and expense would be wasteful and futile"). 
Issue one is overruled.

III. The Shackling of Padron

 In issue three, Padron contends the trial court erred in denying his motion for a
mistrial because during the trial the jury saw him shackled in the courtroom, which Padron
claims violated his constitutional right to the presumption of innocence. During the
punishment phase while the jury was seated in the courtroom, Padron's defense counsel,
Doug Tinker, told the trial court that Padron needed to use the restroom. Padron's other
counsel, James Granberry, asked the trial court, "[M]ay we have the jury excused?" The
trial court replied, "No. He just needs to go to the rest room. Go ahead." At that point,
Tinker asked to approach the bench, and the trial court excused the jury from the
courtroom. When the jury was out of the courtroom, Tinker objected "to the fact that it was
now obvious that our client is chained, and Mr. Granberry tried to make a request to avoid
the jury finding out he was chained here at the table, and because the jury now knows, we
request a mistrial, Your Honor." The trial court denied the motion for mistrial and stated,
"Take him to the bathroom so he can come back and we can finish up." Padron then left
the courtroom and returned. Afterwards, the jury returned to the courtroom.

A. Applicable Law

 The Fourteenth Amendment of the United States Constitution (6) and Article I, Section
19 of the Texas Constitution (7) guarantee an accused the right to a fair trial. Long v. State,
823 S.W.2d 259, 282 (Tex. Crim. App. 1991); Wynn v. State, 219 S.W.3d 54, 59 (Tex.
App.-Houston [1st Dist.] 2006, no pet.) (citing Estelle v. Williams, 425 U.S. 501, 503
(1976)). One of the constituent elements of this guarantee, which is directly implicated by
the shackling of an accused during trial proceedings, is that "the criminal process
presumes that the defendant is innocent until proven guilty." Wynn, 219 S.W.3d at 59. An
accused who is visibly shackled does not have the benefit of this presumption, and thus
his or her right to a fair trial is fundamentally compromised. Id. Shackling has principally
been held to be harmful error when the shackles are detectible to the jurors. Deck v.
Missouri, 544 U.S. 622, 630-31 (2005); Wynn, 219 S.W.3d at 60-61.

 Padron contends that the jury saw him shackled in the courtroom. However, the
record does not reflect that the jury actually saw that Padron was shackled or that the jury
heard the sound of his shackles. (8) The only reference to the shackles came from defense
counsel when addressing the trial court outside the jury's presence. The court of criminal
appeals and various courts of appeals have consistently held that, in the absence of
evidence that the jury actually saw the restraints, an accused is not harmed or prejudiced. (9)

 Even if we were to conclude that the jurors had seen the shackles, we must
determine whether this constituted harmful error. See Tex. R. App. P. 44.2(a). Because
the use of shackles implicates constitutional rights, an appellate court must "reverse a
judgment of conviction or punishment unless [it] determines beyond a reasonable doubt
that the [shackling] did not contribute to the conviction or punishment." Wynn, 219 S.W.3d
at 60. In this case, the error complained of occurred during the punishment stage and,
therefore, had no effect on the jury's finding of his guilt. Because the jury rejected the
death penalty, life imprisonment was the only available punishment option. See Tex.
Penal Code Ann. § 12.31(a) (Vernon Supp. 2008). Accordingly, we can determine beyond
a reasonable doubt that even if the jury had seen the shackles, this did not contribute to
Padron's convictions or his punishment. Issue three is overruled.

IV. Admission of Photographs


 In issue two, Padron contends the trial court erred in admitting a photograph into
evidence because it was irrelevant and unfairly prejudicial to him. During cross-examination at the guilt-innocence stage, Garcia testified that: (1) he was facing twenty-five to thirty-five years in prison; (2) he knew that if he helped Sales, the lead prosecutor
in this case, he would "get a deal"; (3) he was in jail with Padron and Martin Robles two
years prior to trial; (4) he had all his cases disposed of about a year-and a-half before trial;
and (5) he had pleaded guilty to two counts of aggravated robbery and was serving a
fifteen-year sentence for both offenses.

 On re-direct examination, Sales asked Garcia, "Mr. Tinker [defense counsel] has
asked you some questions about the benefits that you received, which include going to
prison for 15 years as a snitch. Can you educate the jury on what is the status of a snitch
in prison?" Garcia replied that "anything could happen to you while you're in prison." 
When Sales asked Garcia if "any bad things" had happened since he agreed to start
testifying, he replied that his "sister got stabbed by another RU member." (10) Sales then
offered State's exhibits 75 and 76 into evidence, which were photographs showing three
stab wounds to Garcia's sister's back. Padron's counsel objected on the grounds that the
photographs were "highly prejudicial, and there's no proof that he [Padron] did it." The trial
court overruled the objection and admitted the photos into evidence.

A. Standard of Review

 An appellate court reviews a trial court's decision to admit or exclude evidence
under an abuse of discretion standard. Cameron v. State, 241 S.W.3d 15, 19 (Tex. Crim.
App. 2007). A trial court abuses its discretion when its decision is so clearly wrong that it
falls outside that zone within which reasonable persons might disagree. McDonald v.
State, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005). Because trial courts are in the best
position to decide questions of admissibility, an appellate court should uphold a trial court's
admissibility decision when that decision is within the zone of reasonable disagreement. 
Cameron, 241 S.W.3d at 19. An appellate court may not reverse a trial court's decision
regarding the admissibility of evidence solely because it disagrees with the decision. Id.

 As a general rule, evidence is relevant if it has "any tendency to make the existence
of any fact that is of consequence to the determination of the action more probable or less
probable than it would be without the evidence." Tex. R. Evid. 401. Evidence that is not
relevant is not admissible. Tex. R. Evid. 402. Furthermore, the trial court's determination
of relevancy will not be reversed absent an abuse of discretion. Reese v. State, 33 S.W.3d
238, 240 (Tex. Crim. App. 2000). However, relevant evidence may be excluded if its
probative value is substantially outweighed by the danger of unfair prejudice. Tex. R. Evid.
403; Andrade v. State, 246 S.W.3d 217, 227 (Tex. App.-Houston [14th Dist.] 2007, pet.
filed). Therefore, upon further objection from the opponent of the evidence based on rule
403, the trial court must weigh the probativeness of the evidence against the potential for
unfair prejudice. Andrade, 246 S.W.3d at 227 (citing Montgomery v. State, 810 S.W.2d
372, 389 (Tex. Crim. App. 1991)). Evidence is unfairly prejudicial when it has an undue
tendency to suggest an improper basis for reaching a decision. Reese, 33 S.W.3d at 240. 
In keeping with the presumption of admissibility of relevant evidence, there is a
presumption that relevant evidence is more probative than prejudicial. Andrade, 246
S.W.3d at 227 (citing Santellan v. State, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997)). 
The trial court's ruling whether to exclude evidence under rule 403 is also measured by an
abuse of discretion standard and will not be reversed if the ruling is within the zone of
reasonable disagreement. Id.

B. Did the Danger of Unfair Prejudice Substantially Outweigh the Probative Value
of the Evidence?


 Padron argues the prejudicial effect of the photographs substantially outweighed
their probative value; therefore, the trial court should have excluded them. A trial court
may exclude relevant evidence under rule 403 "if its probative value is substantially
outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the
jury, or by considerations of undue delay, or needless presentation of cumulative
evidence." Tex. R. Evid. 403. When a trial court balances the probative value of the
evidence against the danger of unfair prejudice, a presumption exists that favors the
evidence's probative value. Feldman v. State, 71 S.W.3d 738, 754-55 (Tex. Crim. App.
2002). The relevant criteria for determining whether the prejudice of admitting the
evidence substantially outweighs the probative value include the following: (1) the
probative value of the evidence; (2) the potential the evidence has to impress the jury in
an irrational but nevertheless indelible way; (3) the time needed to develop the evidence;
and (4) the proponent's need for the evidence to prove a fact of consequence. State v.
Mechler, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005); Andrade, 246 S.W.3d at 228. 
Using these factors as a guide, if the record reveals the probative value of the evidence
was not substantially outweighed by the danger of unfair prejudice, then we should
conclude the trial court did not abuse its discretion in admitting the photographs. See
Reese, 33 S.W.3d at 241; Andrade, 246 S.W.3d at 228 (citing Montgomery, 810 S.W.2d
at 393).

C. Analyzing the Mechler factors

 1. The Probative Value of the Evidence

 The term "probative value" refers to the inherent probative force of an item of
evidence; that is, how strongly it serves to make more or less probable the existence of a
fact of consequence to the litigation. Casey v. State, 215 S.W.3d 870, 879 (Tex. Crim.
App. 2007). Here, defense counsel attacked Garcia's credibility by eliciting testimony that
gave the impression that Garcia received only fifteen years in prison for pleading guilty to
two aggravated robberies because he had agreed to testify against Padron. Therefore, the
photographs had probative value because they bolstered Garcia's testimony that testifying
as a "snitch" had detrimental consequences; that is, injury to his sister.

 2. The Potential to Impress the Jury in an Irrational but Nevertheless Indelible
Way


 Rule 403 does not exclude all prejudicial evidence. Andrade, 246 S.W.3d at 228-29. Virtually all evidence a party offers will be prejudicial to the opponent's case, or the
party would not offer it. Casey, 215 S.W.3d at 883. Instead, rule 403 focuses only on the
danger of unfair prejudice and the tendency to tempt the jury into finding guilt or innocence
on grounds apart from proof of the offense charged. Andrade, 246 S.W.3d at 229. The
photographs present little, if any, prejudice to Padron because no party suggested to the
jury that Padron was connected to the stabbing of Garcia's sister. Furthermore, Garcia did
not testify that Padron played any role in the stabbing incident. We find the photographs
did not potentially impress the jury in an irrational way.


 3. The Time Needed to Develop the Evidence

 The time involved in the introduction of two photographs is minimal and unlikely to
distract the jury from considering the charged offense. See Andrade, 246 S.W.3d at 229
(holding the time involved in the introduction of a photograph was minimal).

 4. The Proponent's Need for the Evidence to Prove a Fact of Consequence

 The court of criminal appeals has pointed out three subparts when assessing the
proponent's need for the evidence: (1) does the proponent have other available evidence
to establish the fact of consequence the evidence is admissible to show; (2) if so, how
strong is that other evidence; and (3) whether the fact of consequence is related to an
issue that is in dispute. Reese, 33 S.W.3d at 242. Garcia testified that one of the bad
things that happened since he agreed to start testifying was that his sister was stabbed in
the back. Bearing in mind that counsel had previously attacked Garcia's credibility, the
State was entitled to rehabilitate Garcia's testimony about the stabbing incident. The
record does not reflect whether the State could have offered other evidence to solidify
Garcia's testimony about the stabbing. However, keeping in mind the third Mechler factor,
the time involved in the introduction of the two photographs was minimal and unlikely to
distract the jury from considering the charged offense when compared to having Garcia's
sister testify before the jury. Therefore, the State's need for the evidence to prove a fact
of consequence was strong.

 After evaluating the four Mechler factors and balancing the prejudicial nature of the
photographs against their probative value, we conclude the prejudicial effect of the
photographs did not substantially outweigh their probative value. See Mechler, 153
S.W.3d at 990. We cannot say the trial court's decision to admit them into evidence was
so clearly wrong that it fell outside that zone within which reasonable persons might
disagree. Thus, the trial court did not abuse its discretion in admitting the photographs. 
See McDonald, 179 S.W.3d at 576. We overrule the second issue.

V. Jury Argument

 In issue four, Padron contends the trial court erred in overruling counsel's objection
to the prosecutor's comments concerning Padron's failure to testify. The approved general
areas of argument are summation of the evidence, reasonable deduction from the
evidence, answer to opposing counsel's argument, and plea for law enforcement. 
Wesbrook v. State, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). Neither the trial judge nor
the prosecution may comment on the defendant's failure to testify, and any comment
thereon violates the Fifth Amendment privilege against self-incrimination. (11) Cruz v. State,
225 S.W.3d 546, 548 (Tex. Crim. App. 2007) (citing Griffin v. California, 380 U.S. 609, 614
(1965)); see Tex. Code Crim. Proc. Ann. art. 38.08 (Vernon 2006). To violate the right
against self-incrimination, the offending language must be viewed from the jury's
standpoint and the implication that the comment referred to the defendant's failure to testify
must be clear. Cruz, 225 S.W.3d at 548. It is not sufficient that the language might be
construed as either an implied or indirect allusion. Id. The test is whether the language
used was manifestly intended or was of such a character that the jury would necessarily
and naturally take it as a comment on the accused's failure to testify. Id. "In applying this
standard, the context in which the comment was made must be analyzed to determine
whether the language used was of such character." Id. (citing Bustamante v. State, 48
S.W.3d 761, 765 (Tex. Crim. App. 2001)).

 Padron argues that three statements made by the lead prosecutor, constituted
impermissible comments on his failure to testify. These comments occurred during 
Sales's closing argument to the jury at the punishment stage. In the first instance, Sales
argued:

 What did Francisco Cabrialez testify to you about what Joe David
Padron said to him about unmasking himself? "Hey, I only unmasked myself
once, I won't do that next time." What does that mean? Does that mean,
"Oh, I will never kill again?" Do you honestly believe that that's what that
statement, with a straight face, could you look into a mirror and tell yourself,
"Yeah, I believe that's what he meant, that he'd never kill again," or did he
mean that, "Next time I'll keep my mask on." What do you think he meant? 
Next time he'd do a better job of committing the crime. There was not an
expression of remorse in that statement that he made to Mr. Cabrialez. It
was a statement of-


At this point, defense counsel objected, "I believe that's a comment on my client's failure
to testify. We object to it." The trial court overruled the objection.

 In the second instance, Sales argued:

 I'm asking you not to let him kill anybody else. Don't allow him to get
in prison and continue his role as a captain and make it available whether or
not he calls into question or asks that someone else be killed, whether he
does it himself or calls for the order. It's disrespect of human life. His
comments to Francisco Cabrialez, "I shouldn't have unmasked myself,"
there's no remorse. Is that mitigating? Is it a fact that-


At this point, counsel stated, "He continues to comment on my client's failure to testify
about remorse." The trial court did not rule on the objection; rather, the court stated: "Just
argue the evidence, sir." To preserve error on appeal for improper jury argument, the
defendant must object to the comment and pursue the objection until the trial court rules
adversely. Cockrell v. State, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996). Counsel objected
to the alleged improper comment, but the record does not show that the trial court ruled
on the objection.

 Nevertheless, in both instances, viewing the complained-of comments from the
jury's standpoint, we do not believe the language used was manifestly intended or was of
such a character that the jury would necessarily and naturally take it as a comment on
Padron's failure to testify. See Cruz, 225 S.W.3d at 598. Sales was referring to Francisco
Cabrialez's testimony that Padron had told him, "I only unmasked myself one time, and I
won't make the same mistake again." Sales's comments that "[t]here was not an
expression of remorse in that statement" and "there's no remorse" are reasonable
deductions from the evidence. When there is evidence in the record indicating a lack of
remorse, a comment on the defendant's lack of remorse does not naturally and necessarily
lead the jury to understand it to be a comment on the defendant's failure to testify. Searcy
v. State, 231 S.W.3d 539, 549 (Tex. App.-Texarkana 2007, pet. ref'd). 

 The third instance relates to an incident between Padron and Ricardo Romero, the
bailiff for the court which tried Padron's case. During the punishment stage, Romero
testified for the defense. On direct-examination, defense counsel asked Romero about an
incident when he (Romero) was escorting Padron out the door. "[O]n this occasion, was
it a touch that you thought he [Padron] was trying to check you out and see if you had a
weapon?" He replied, "I don't believe so." When defense counsel asked Romero if Padron
had touched him on the arm, he replied, "I think it was my side." On cross-examination,
Romero testified that he was not wearing a weapon when Padron touched his side. When
Sales asked Romero, "By touching your side, was . . . Mr. Padron able to identify the fact
that you were not wearing a weapon?", he replied, "I don't think so." Romero said the
incident was reported. When Sales asked Romero, "So by that reporting of that
happening, would you say that that--were you more careful after that?", he replied, "That
cured the situation, yes."

 In his closing argument, Sales argued:

 Now, the testimony about the bailiff Ricardo Romero. Is that
something that was blown all out of proportion, that you know, the defendant
was patting him, was just being affectionate, just being friendly? Well,
maybe he was just being affectionate and friendly. You know, that's
possible. But the danger, ladies and gentlemen, is, when you underestimate
your adversary, when you underestimate the people on the other side, and
that's how you get killed. That's how mistakes are made. That's how people
get hurt. That's true in many walks of life, whether you're dealing with
someone in business and you underestimate them, or from the athletic field
and you underestimate them. Only Joe David Padron knows what was going
on in his mind when he patted-


At this point, counsel objected, "[T]hat's another comment on Joe David Padron's failure
to testify." The trial court overruled the objection.

 Here, we must examine Sales's comment in context. Bustamante, 48 S.W.3d at
765. When defense counsel asked Romero, "[W]as it a touch that you thought he [Padron]
was trying to check you out and see if you had a weapon?", Romero replied, "I don't
believe so." Based upon this reply, Romero could not say for sure whether Padron had
touched Romero in order to detect whether he had a weapon. Thus, Sales's comment that
"Only Joe David Padron knows what was going on in his mind when he patted--" is a
reasonable deduction from the evidence that Romero did not know Padron's motive for
touching him. Thus, when viewed from the jury's perspective, we are unable to conclude
that the language was manifestly intended or of such a character that the jury would
necessarily and naturally take it as a comment on Padron's failure to testify. See Cruz, 225
S.W.3d at 548. Issue four is overruled.

VI. Motion for New Trial


 In issue five, Padron contends the trial court erred in denying his motion for new trial
based upon newly discovered evidence and in refusing to admit exculpatory evidence at
the motion for new trial hearing. Padron's post-trial attorney, Bill May, filed a motion for
new trial alleging that Cabrialez committed perjury when he testified as the State's rebuttal
witness. Specifically, the motion alleged: (1) that Cabrialez testified falsely against Padron
because Padron's family did not pay Cabrialez $2,000 as requested; and (2) that Cabrialez
had a motive to testify against Padron because Cabrialez blamed Padron for Cabrialez's
murder conviction and life sentence.

A. Standard of Review

 Article 40.001 of the code of criminal procedure provides: "A new trial shall be
granted an accused where material evidence favorable to the accused has been
discovered since trial." Tex. Code Crim. Proc. Ann. art. 40.001 (Vernon 2006); Wallace
v. State, 106 S.W.3d 103, 107 (Tex. Crim. App. 2003). However, a trial court has
discretion to decide whether to grant a new trial based upon newly discovered evidence,
and we will not reverse the ruling absent an abuse of discretion. See Keeter v. State, 74
S.W.3d 31, 37 (Tex. Crim. App. 2002). We do not substitute our judgment for the trial
court's judgment, but rather we decide whether the trial court's decision was arbitrary or
unreasonable. Holden v. State, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006); Charles v.
State, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004). We must view the evidence in the
light most favorable to the trial court's ruling, and we presume that all reasonable factual
findings that could have been made against the losing party were made against that losing
party. Charles, 146 S.W.3d at 208. A trial court abuses its discretion in denying a motion
for new trial only if no reasonable view of the record could support the trial court's ruling. 
Holden, 201 S.W.3d at 763; Charles, 146 S.W.2d at 208; Lewis v. State, 911 S.W.2d 1,
7 (Tex. Crim. App. 1995).

B. Motion for New Trial Hearing

 The trial court held a hearing on the motion for new trial at which Mr. May called
three witnesses and introduced all four exhibits.


 1. Testimony of Iris Cabrialez

 Francisco Cabrialez's cousin, Iris Cabrialez, testified that Francisco's mother told
her that Francisco "was requesting $2,000 from . . . [Padron's] family, and if he didn't get
it, that he was gonna say something. He didn't specify exactly what it was he was gonna
say, but he said he would say something" "negative" about Padron. When Francisco took
the witness stand to testify for the State, Iris was supposed to "nod my head yes or no if
he [Francisco] were to get the money." However, when Francisco took the stand, she
made no indication to him about the money because she "didn't know what to do" and "was
scared." She told Padron's family members about Francisco's request for the $2,000, but
she did not receive any money. Iris did not report this alleged scheme to either the trial
court or law enforcement.

 On cross-examination, she testified that after working three-and-one-half years as
a corrections officer at the Nueces County Jail, she was "terminated" (12) from the jail, "got
[her] job back," and "resigned."

 2. Testimony of James Granberry

 James Granberry (13) testified that he first heard about the alleged "$2,000 bribe" (14)
while the jury was deliberating on Padron's guilt or innocence. Granberry stated that when
he spoke to Iris about the alleged scheme, she told him Francisco had offered to tell the
truth for $2,000, and that Iris was supposed to stand up when Francisco walked into the
courtroom, indicating that, "yes, there was gonna be $2,000, and if she didn't stand up, that
would be, no, that there wasn't $2,000." He also testified: "[T]here were some other, you
know, things that made us think that maybe the story wasn't completely straight, . . . ."

 3. Testimony of Kenneth Botary

 Kenneth Botary (15) testified that he spoke with Francisco prior to Francisco's
testimony at Padron's trial. Botary did not learn anything about a supposed demand or
request by Francisco to receive money or else he would testify unfavorably against Padron.

 After hearing the evidence and counsels' arguments, the trial court denied the
motion for new trial.

C. Whether the Trial Court Erred in Refusing to Admit Four Letters into Evidence
at the Motion for New Trial Hearing


 1. Standard of Review

 We review a trial court's admission or exclusion of evidence for abuse of discretion. 
McDonald v. State, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005). "A trial court abuses its
discretion when its decision is so clearly wrong as to lie outside that zone within which
reasonable persons might disagree." Id.

 a. The Trial Court's Exclusion of Defendant's Exhibits 1 and 4

 At the motion for new trial hearing, Iris testified that after Francisco testified in
Padron's trial, she received four letters from him. Three of these letters, defendant's
exhibits 1 through 3, were written by Francisco to her. The fourth letter, defendant's exhibit
4, was delivered to her, but written to Padron's mother. When May offered exhibits 1 and
4 into evidence as a declaration against penal interest and for impeachment purposes, (16)
the trial court sustained the State's hearsay objection and admitted them only for the
purpose of a bill of exception. (17)

 (i) Were Exhibits 1 and 4 Admissible as Statements Against Penal
Interest?


 Hearsay is defined as "a statement, other than one made by the declarant while
testifying at the trial or hearing, offered in evidence to prove the truth of the matter
asserted." Tex. R. Evid. 801(d), see Schaffer v. State, 777 S.W.2d 111, 115 (Tex. Crim.
App. 1989). One type of hearsay that may be admitted under the exceptions to the
hearsay rule (18) is a statement against interest under Rule 803(24). (19) Determining whether
a statement is admissible as a statement against interest under Rule 803(24) involves a
two-step inquiry. Bingham v. State, 987 S.W.2d 54, 57 (Tex. Crim. App. 1999). First, the
trial court determines whether the statement tends to expose the declarant to criminal
liability. Id. Second, corroborating evidence must "clearly indicate the trustworthiness of
the statement." Tex. R. Evid. 803(24); Bingham, 987 S.W.2d at 57; see also Dewberry v.
State, 4 S.W.3d 735, 751 (Tex. Crim. App. 1999). The party seeking admission of the
statement bears the burden to make this showing and "the test is not an easy one." Davis
v. State, 872 S.W.2d 743, 749 (Tex. Crim. App. 1994).

 Here, exhibits 1 and 4 do not tend to expose Francisco to criminal liability. And,
even if they did, there is no corroborating evidence to "clearly indicate the trustworthiness
of the statement." Tex. R. Evid. 803(24); Bingham, 987 S.W.2d at 57. Thus, we conclude
that Padron has not satisfied the two-part inquiry. See Bingham, 987 S.W.2d at 57. We
hold the trial court did not abuse its discretion by excluding both exhibits on this basis. See
Bingham, 987 S.W.2d at 57 (trial court's decision to admit or exclude evidence of
statement against interest is reviewed under abuse of discretion standard).

 (ii) Were Exhibits 1 and 4 Admissible for Impeachment Purposes?


 Rule 806 provides the declarant of a previously admitted hearsay statement may
have his or her credibility attacked by any evidence "admissible for those purposes" if the
declarant had testified as a witness. See Tex. R. Evid. 806. In exhibit 1, Francisco stated:

 I could've beat my case if he [Padron] have never put hit [sic] foot in. Believe
it, because that's the truth. He told Kid not to help me out because that
would mess up his, Joe David's, chances and his, Kid's, appeal. So really
I'm sitting on a life because he put his two cents in my case. He went
against me. He did that.


 This portion of the letter involves "hearsay upon hearsay," an out-of-court statement
(the letter) to prove the matter asserted in another out-of-court statement (Padron's
statement to Kid) and is, therefore, incompetent evidence for impeachment purposes under
Rule 806. See Davis v. State, 791 S.W.2d 308, 309-10 (Tex. App.-Corpus Christi 1990,
pet. ref'd).

 We note that in both letters, Francisco expresses his anger at Padron. Francisco
does not say, however, that he lied when he testified for the State. Thus, we cannot say
the trial court abused its discretion by excluding these letters from evidence.

 b. The Trial Court's Exclusion of Defendant's Exhibits 2 and 3

 May did not offer Defendant's Exhibits 2 and 3 into evidence; rather, he offered
them "for purposes of the bill." (20) Because they were not offered into evidence, we cannot
say that the trial court abused its discretion in excluding them. (21)

D. Applicable Law and Analysis

 A defendant seeking a new trial based upon newly discovered evidence must show: 
(1) the newly discovered evidence was unknown to the defendant at the time of trial; (2)
the failure to discover the new evidence was not due to the defendant's lack of due
diligence; (3) the new evidence is admissible and not merely cumulative, corroborative,
collateral, or impeaching; and (4) the new evidence is probably true and will probably bring
about a different result in a new trial. Wallace, 106 S.W.3d at 107 (citing Keeter, 74
S.W.3d at 36-37). Here, neither the testimony nor any of the four letters show that Padron
was not involved in the murders; rather, the evidence serves to impeach Francisco
Cabrialez's testimony, an impermissible reason to grant Padron's motion for new trial
based on newly discovered evidence. Furthermore, the trial court could have chosen to
disbelieve Iris Cabrialez's testimony and the contents of Francisco's four letters. As the
fact finder, the trial judge has "the right to accept or reject any part of" a witness's
testimony. Beck v. State, 573 S.W.2d 786, 791 (Tex. Crim. App. 1976).

 Viewing the evidence in the light most favorable to the trial court's ruling, we hold
that the trial court did not abuse its discretion in denying the motion for new trial. See
Keeter, 74 S.W.3d at 37. Issue five is overruled.

 We affirm the trial court's judgment.



 

 

 ROSE VELA

 Justice



Do not publish.

Tex. R. App. P. 47.2(b).


Memorandum Opinion delivered and

filed this 14th day of August, 2008.
1. Martin Robles was tried separately for the murders of Jesus Gonzalez and John Commisky. He was
found guilty of two counts of capital murder and sentenced to death. See Robles v. State, 2006 WL 1096971
(Tex. Crim. App. April 26, 2006) (not designated for publication).
2. See Tex. Penal Code Ann. §§ 19.03(a)(2), (7)(A) (Vernon Supp. 2008). Specifically, the jury
convicted Padron of murdering Jesus Gonzalez and John Commisky during the same criminal transaction
(one count), and the jury convicted him of murdering each victim in the course of committing or attempting
to commit burglary of a habitation (two counts).
3. See Tex. Penal Code Ann. § 12.31(a) (Vernon Supp. 2008).
4. Sergeant Gerald Silva, a gang investigator with the Nueces County Sheriff's Office, testified that
Padron is a member of RU.
5. The trial court instructed the jury: "Ladies and gentlemen of the jury, there might have been a
statement that was said earlier by this defendant. You are to disregard that statement, and we'll pick up from
this point forward."
6. See U.S. Const. amend. XIV.
7. See Tex. Const. art. I, § 19.
8. After the trial court denied the motion for mistrial, the following exchange occurred between James
Sales (the lead prosecutor), the trial court, and Tinker:

 

 Sales: Your Honor, may the record also reflect there was not any clinging of chains
for the jury, that no movement was made for the Defendant to remove the
chains in front of the jury?


 The Court: The record will reflect that the court is a lot closer to the Defendant than the
jury, and I heard nothing. That's why I--


 Tinker: I'll agree, Your Honor, there was no clanging, but the man who has Mr.
Padron in custody, at least from my view, bent over towards his feet as I
asked to approach the bench.


 The Court: There was no bending over, Mr. Tinker, that the court observed. So with
that, have a seat. 
9. See Canales v. State, 98 S.W.3d 690, 697-98 (Tex. Crim. App. 2003) (no evidence jury was aware
defendant was shackled during trial); Cooks v. State, 844 S.W.2d 697, 722-23 (Tex. Crim. App. 1992) (no
harm in shackling defendant during trial in absence of evidence jury saw restraints); Long v. State, 823
S.W.2d 259, 283 (Tex. Crim. App. 1991) (while defendant was shackled throughout his trial, even while
testifying, defendant failed to direct court's attention to any place in record showing that jury actually saw
shackles); Simms v. State, 127 S.W.3d 924, 929 (Tex. App.-Corpus Christi 2004, pet. ref'd) (trial court erred
in not stating reason for restraint, but error harmless because record showed defendant who wore electronic
immobilization system throughout trial, had a prior escape attempt, the restraints were concealed, and no
evidence the jurors saw the restraints); Ziolkowski v. State, 223 S.W.3d 640, 644 (Tex. App.-Texarkana 2007,
pet. ref'd) (trial court erred in shackling defendant during trial without providing an adequate reason for the
record, but error harmless because no evidence jury was aware defendant was shackled)..
10. Defense counsel did not object to this testimony.
11. See U.S. Const. amend. V; Tex. Const. art. 1, § 10. 
12. Iris testified they "terminated me because they said I took my cell phone into the jail and accepted
a collect call while I was working, . . . ." 
13. Granberry was one of Padron's trial counsel.
14. On direct-examination, May asked Granberry, "And you've heard the testimony of Ms. Cabrialez
about this notification about the $2,000 bribe. Could you tell us when you first heard about it and what
circumstances?"
15. Botary represented Francisco Cabrialez on a capital murder case prior to Padron's trial.
16. With respect to defendant's exhibit 1, May stated:


 We're offering it in order to show--one, it's offered for impeachment of Cabrialez in the
previous case. Two, it's offered as a declaration against penal interest because in the letter--or DX-1, Mr. Cabrialez less admits to committing a felony, which is perjury, when he testified
in this court. As a declaration against penal interest, it's an exception to the hearsay rule.


With respect to exhibit 4, May stated, "[W]e have the same arguments."
17. May made his bill of exception during the motion for new trial hearing. At that time, Iris Cabrialez
read exhibit 1 into the record:


 "Lynn, first off I want to apologize for what I did, not that I regret it, but because I couldn't
better explain the situation to you. Haven't I ever always tried to keep you away from the BS
concerning RU? You see, I really did want to help you, I really did, but just like you hate this
hell Vino for what he did to you, there is shit this hole Joe David did to me that is way more
than Vino did. There is a lot of shit he did that you don't know about. I could've beat my case
if he have never put hit [sic] foot in. Believe it, because that's the truth. He told Kid not to
help me out because that would mess up his, Joe David's, chances and his, Kid's, appeal. 
So really I'm sitting on a life because he put his two cents in my case. He went against me. 
He did that. Plus there's a lot of other shit he did that you know nothing about. I've asked
you time and again to stay away. You've even told me them mo-fers are only there to fuck
you. Remember that. Now, if you'd have let me know something before I came back, I could
have did something, but I really didn't have enough time to get my mind set, to get myself
over all he did to me. I really did want to help you, believe that. After I walked in there and
saw that smug expression that ho's face, it pissed me off 'cause I couldn't help myself. It
reminded me of all the BS he pulled on me. Ho [sic] was thinking he had pulled one over on
me. I couldn't do it 'cause I couldn't put myself to help someone who wanted to kill innocent
people, someone who had also put you out there like Vino did. There's a lot you don't know. 
I'm sorry for making you look fucked up 'cause I really was gonna help you. Believe that. 
There is just too much shit to explain. If you don't understand what I'm saying, then I don't
know how else to explain it. I just want you to know that I apologize. My intention wasn't to
make you look bad like that. I really intended to help you. You should know I would do
anything for my family. But how would you expect me to help someone who I know fucked
me over and tried to fuck you over, also? Do you really--do you really realize what was being
asked of me? Do you know they wanted to set me up? There's a lot you didn't know. You're
mad at me for the wrong reasons, but it's cool. I know I had your best interest in heart," and
then signed "Your cuz."


She also read exhibit 4 into the record:


 "Senora Reyes, hello and things. It took me a couple of days to realize who it was that sent
me the Christmas card, but I finally figured it out. First off, as you already know, I apologize
for what happened. It wasn't meant to go down like that. I had every intention of making
Sales look stupid, but your son made me mad when he smiled at me. Honestly, I wish he'd
have never called me back. I was already mad about other things, and I just wasn't in the
frame of mind. You see, Senora Reyes, it had nothing to do with me, with my case or time. 
If I was scared of the death penalty, if I didn't want a vida, I would have lied on everyone from
the jump. Like I said, I never asked Sales for consideration on my time because I was
intending to burn him to show everyone how easy it is to lie. I'm sure you know that I had
always claimed your son was not there. Right? After all the games your son played against
me, the pressure he tried to put me on, me to go against my co-defendant who is also
innocent, even after he lied and me to Kid, I still tried to help him by not lying on him. It was
just that instant he smiled at me. I don't know why or what, but I believed I was gonna be
implicated in his case. I don't know why, but I realized though that I wouldn't have cared if
it would've took that, I'd have accepted it. I did it for my co-defendant. I did it for him. He
just angered me. I also helped Chris Suarez. It's what angers me, Senora Reyes. I did what
I could have to help all I believed to be innocent and what did I get? They all spoke bad
about me, put me down. For a couple of months, everyone I helped had turned against me. 
I was here sitting on a vida for doing what was right, and no one did anything to help me,
nothing. It's why I was pissed off, Senora Reyes. It was like people took what I had to offer,
then discarded me. Chris Suarez got out and took off, no appreciation. I'm here in an empty
cell with nothing, in a worser [sic] place than before. I don't understand it, Senora Reyes, but,
you see, it's why I tried to make them give me the death penalty. I've always been one to
help people out even under the threat of the death penalty. I never gave in to the pressure,
and that's because I didn't do anything. I was there, but I didn't know what was gonna
happen. Even like that, Senora, I never considered looking out for myself. I was doing more
to help out--help other people out than myself. I couldn't even get a thanks for not lying, but
it's okay. Now you see part of why I was and am mad, Senora. I'm not trying to justify the
why, Senora, I'm only letting you know why it happened. I know I was wrong. I apologize to
you and the rest of your family. I hope to be able to correct that wrong, Senora. I do have
a lot of info on the case. If possible, send me his lawyer's address so that I could send him
my statement. You can get a copy from the lawyer. I got to do it like that so a copy won't be
made here. Okay? I want you to understand anything I say or do won't be in Robles' favor. 
Okay? You might not realize it, Senora Reyes, but after I step forward for yours, I will be
labeled a snitch by all. I'm willing to do it though because labels have never bothered me. 
As long as I believe in what I'm doing, I don't care what I'm called. My apologies,
sinceramento, Pancho." 
18. See Tex. R. Evid. 803(1)-(24).
19. Rule 803(24) states:


 A statement which was at the time of its making so far contrary to the
declarant's pecuniary or proprietary interest, or so far tended to subject the
declarant to civil or criminal liability, or to render invalid a claim by the
declarant against another, or to make the declarant an object of hatred,
ridicule, or disgrace, that a reasonable person in declarant's position would
not have made the statement unless believing it to be true. In criminal
cases, a statement tending to expose the declarant to criminal liability is not
admissible unless corroborating circumstances clearly indicate the
trustworthiness of the statement.


 Tex. R. Evid. 803(24) (emphasis added).
20. May told the trial court, "And we would offer defendant's exhibit 2 and defendant's exhibit 3 also for
the purposes of the bill." The record does not show that May offered them into evidence.
21. Defendant's exhibit 2 read:


 "What's up cuz? Yeah, I already know. I've been doing a lot of have thinking, but I'll get to
that in a minute. How have you been? Hope is all in the best possible. I've been doing a lot
of thinking. Been under--I've been going from place to place. I finally got to my unit. Yes,
I'm at a different place again. I think you told me your cousin was here. It's all right. Big cell,
my own shower, sort of like 4 Max but a bigger cell and no phone, which sucks. Things could
be better, but all I see and feel is them getting worser [sic], which suck also. Maybe I should
try for some psyche [sic] medication. Either way, let me get to the purpose of my letter. Like
I said, I've been doing a lot of thinking. From what I heard Joe D. still wants me to help him,
and so today, on my birthday of all days, I decided to help him. More for you than anything
else, because the money wouldn't even begin to cover my funeral costs, but get a hold of his
mom, and if the offer is still good, I'll go all out for him, just for his lawyer to get a hold of me,
and I'll make a statement to the truth and to also why I lied. Sales threatened me. If his mom
still wants to do it, then I'll promise to help--I'll promise to her to give it my best. Joe D. knows
I'm of my word. I'll do what I say I'm gonna do. Get back with me ASAP something is agreed
upon so I could be mentally prepared and know what is fixing to happen if anything. Tell his
mom I apologize for all the BS all the BS that her son knows--that her son knows the why and
where of. Nonetheless I apologize to her. Well, I'm also doing it to make it up to you. The
last time we talked I heard your voice and it fucked me up, how you sounded. That I've
hurted [sic] the person that tried to help me out, try to help me when everyone else had left
me for dead. It fucked me up. Hopefully I can make it up for it. I'm gonna try. This is gonna
be the one good thing I do before my days come to an end, one good, one bad and one for
the continuance of my spirit after I'm gone. You get the idea. Well, cuz, I'll close up--I'll close
before I use your shoulder to cry on. This was the sorriest fucking birthday I could ever
remember, but I won't drown you in my tears and regrets." Says, "Later, your cuz, me."


Defendant's exhibit 3 read:


 "Damn, I've been asleep for two days straight with no medication. I couldn't wake up. I finally
woke up after this weird ass dream I had. It was crazy. I wish I could sleep till I crow. That
would be cool. How did your Christmas go? What did you-all do? I heard someone saying
it snowed in Houston and Corpus. How--has your sister had her baby already? Say, if you
don't mind, send me my sister's address so I can drop her some lines. On Melissa, she was
in jail. Sales put out warrants on everyone he could who talked in my favor. Even my mom
got her license took when she visited me the last time. I was there because of some
outstanding ticket. They didn't arrest her, just took her license, but if they would've I'd have
gone off the hook every chance I got. It's why I want only half of what I asked for when I write
the statement and the other half when we go back. Ask her if it's cool. Because I want to
say--I want to pay my mom's ticket, so then--so them ho's won't mess with her. Sales--Sales
knows it's been the only way he's been able to stop me from exposing certain stuff. Well,
say, cuz, I might feel kind of bad for what I did, but I'm doing it for you. My conscience
doesn't bother me. I know Joe D. for--for what he is. I did--I did to him what he wanted me
to do to Mike. Now he knows how it feels. He's lucky you got involved, else he'd stay hear
with me till we're both dead. The price for all the BS he pulled against me in the county. It's
cool. I'm not even gonna sweat the BS, cuz, not even my appeal, whatever shit, it doesn't
matter. I'm just correcting my wrongs, so when I do leave, it will be with a clear state. I feel
for the innocent, cuz, but sometimes some people got to be kicked down a notch. I don't
even want to go into that because I'll get pissed off again, but I want to point out one thing
to you. Out of all of them, why was I the only one not lied on? Why do the snitches get a
deal and lie on me? I was around them longer than everybody else--everyone else. I was
in the middle of all the BS. Something to ponder, huh? Say, I need a favor. I'm not sure
when--I'm not sure where to write to. I need the address to the Caller-TImes newspaper if
you can, I'd appreciate it. I got to write someone there. Before I forget, don't let me [sic]
mom know what I'm gonna do." Says, "Well, say, cuz, I'm gonna close for now. I just woke
up to write back real quick. I'm gonna go back to sleep