

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-23-00090-CR

Jessica **BRIONES**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 187th Judicial District Court, Bexar County, Texas
Trial Court No. 2021CR8893
Honorable Stephanie R. Boyd, Judge Presiding

Opinion by:     Beth Watkins, Justice

Sitting:         Patricia O. Alvarez, Justice
                 Irene Rios, Justice
                 Beth Watkins, Justice

Delivered and Filed: May 15, 2024

AFFIRMED

In five issues, appellant Jessica Briones challenges her murder conviction. We affirm the trial court's judgment.

### BACKGROUND

On September 5, 2017, Briones sought help at a San Antonio Police Department substation near her apartment because her four-year-old daughter, O.B., was unconscious and having trouble breathing. Witnesses who assessed O.B. at the substation testified that she was not moving, she did not respond to touch or the sound of her name, and her eyes did not react to light.

Paramedics transported O.B. by ambulance to University Hospital, where doctors discovered she had suffered a severe brain injury. O.B.'s CT scans showed "her brain had no gray/white differentiation," which "meant that she probably had pretty profound" injury caused by lack of blood to her brain. O.B.'s brain was also "shifted over," which "takes a lot of pressure." The swelling in O.B.'s brain caused intracranial pressure that indicated "a non-survivable injury[.]" Police officers, a paramedic, and physicians who observed and/or treated O.B. noted that she also had multiple other injuries, including: new and old bruises on her face, abdomen, back, arms, hands, and ankles; scratches and scarring on her hands and feet; scars and a healing laceration on her scalp; scabs on her ears; a deformity called myositis ossificans[1] in both arms; and a retinal hemorrhage.

O.B. never regained consciousness, and on September 6, 2017, she died after physicians removed her from life support. The medical examiner who performed her autopsy testified that her fatal brain injury was "consistent with being hit with an object or the head impacting some object itself." He concluded her manner of death was homicide.

In September of 2021, a Bexar County grand jury indicted Briones on two counts: (1) murder in the course of committing felony injury to a child; and (2) serious bodily injury to a child. The State separately sought an affirmative deadly weapon finding. After a three-week trial, the jury found Briones guilty on both counts in the indictment and found that she had "used or exhibited a deadly weapon, namely, a wall, a metal bracket, a door frame, and/or an object unknown to the grand jury" in the commission of those offenses.[2] The jury assessed punishment at life in prison. The trial court signed a judgment consistent with the jury's verdict that included

---

[1] A physician who testified at trial described myositis ossificans as calcification of the muscle that is caused by repetitive trauma.
[2] For punishment purposes, the State agreed to set aside the jury's finding of guilt on count 2 of the indictment.

affirmative findings of deadly weapon and family violence. After her motion for new trial was overruled by operation of law, Briones timely appealed.

**ANALYSIS**

***Sufficiency of the Evidence***

In her first two issues, Briones argues the evidence is legally insufficient to support the deadly weapon finding and her murder conviction.

*Standard of Review*

We review a challenge to the sufficiency of the evidence under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). Under that standard, we examine all the evidence in the light most favorable to the verdict and resolve all reasonable inferences from the evidence in favor of the jury's verdict to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Nowlin v. State*, 473 S.W.3d 312, 317 (Tex. Crim. App. 2015). We do not ignore any evidence "because the standard requires a reviewing court to view all of the evidence in the light most favorable to the verdict." *Cary v. State*, 507 S.W.3d 750, 759 n.8 (Tex. Crim. App. 2016) (internal quotation marks and emphasis omitted).

In reviewing the sufficiency of the evidence, we may consider "'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)). Circumstantial evidence is as probative as direct evidence to establish guilt, and we review circumstantial and direct evidence under the same standard of review. *Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010). "Each fact need not point directly and independently to

the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

"An appellate court cannot act as a thirteenth juror and make its own assessment of the evidence." *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018). Our role "is restricted to guarding against the rare occurrence when the factfinder does not act rationally." *Id*.

*Applicable Law*

A person commits felony murder if, inter alia, she "commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt . . . [she] commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual[.]" TEX. PENAL CODE ANN. § 19.02(b)(3). A person commits the offense of injury to a child if, inter alia, she intentionally or knowingly causes serious bodily injury or bodily injury to a person under the age of 14. TEX. PENAL CODE ANN. § 22.04(a), (c)(1). The offense of injury to a child can serve as the necessary predicate for a felony murder finding. *See Contreras v. State*, 312 S.W.3d 566, 583–84 (Tex. Crim. App. 2010).

"Deadly weapon" means, inter alia, "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07(a)(17)(B). A deadly weapon need not "possess[] any particular trait or characteristic other than its capacity to cause death or serious bodily injury." *Mims v. State*, 335 S.W.3d 247, 250 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). A factfinder may make a deadly weapon finding even if the object in question is unknown. *See Mixon v. State*, 781 S.W.2d 345, 346 (Tex. App.—Houston [14th Dist.] 1989), *aff'd*, 804 S.W.2d 107 (Tex. Crim. App. 1991) (per curiam); *Stanul v. State*, 870 S.W.2d 329, 334 (Tex. App.—Austin 1994, pet. dism'd) (per curiam). However, the record must contain "evidence on the manner in which" the alleged deadly weapon is used. *Mixon*, 781 S.W.2d at 346.

*Application*

In her first issue, Briones argues the evidence was insufficient to support a finding that she used a wall, a door frame, a metal bracket, or an unknown object as a deadly weapon. In her second issue, she argues that without a deadly weapon finding, the evidence was insufficient to support the jury's finding that she murdered O.B. In both issues, she argues the jury's findings were based on speculation.

A. The indictment did not require the State to prove O.B.'s death was caused by a deadly weapon.

Briones argues the State was required "to establish beyond a reasonable doubt that [O.B.'s] death was caused by [Briones's] use of a deadly weapon." In the case she cites for this proposition, *Parris v. State*, the indictment specifically alleged the appellant caused the decedent's death "by striking [him] in the head and neck with a deadly weapon." *Parris v. State*, 757 S.W.2d 842, 843 (Tex. App.—Dallas 1988, pet. ref'd). Based on that wording, the *Parris* court concluded the State was required "to prove that death was caused by a deadly weapon as alleged." *Id.* at 845. Here, in contrast, the indictment alleged Briones caused O.B.'s death by striking her with or against several named objects or "an object unknown to the grand jury"; critically, it did not specifically allege that any of those objects were deadly weapons. *Compare id.*, *with Hilla v. State*, 832 S.W.2d 773, 779 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd) (distinguishing *Parris* because "this indictment [in *Hilla*] did not allege that death was caused by striking the victim with a deadly weapon" but instead alleged "the complainant's death was caused by appellant striking him with a hand and kicking and stamping him with a foot"); *see also Duran v. State*, 492 S.W.3d 741, 746 (Tex. Crim. App. 2016) (noting deadly weapon finding may be based on specific allegation in indictment or "in response to submission of a special issue" for punishment purposes).

In this case, the deadly weapon issue was introduced not by the indictment, but by the State's notice of its intent to seek an affirmative finding that Briones had used a deadly weapon during the commission of the offenses with which she was charged. The State's notice of intent indicated that it sought this affirmative finding to limit Briones's eligibility for parole and/or community supervision, not as an additional element of the offenses with which she was charged. *See* Tex. Code Crim. Proc. Ann. art. 42A.054(b)–(d); Tex. Gov't Code Ann. § 508.149(a)(1); *see also Duran*, 492 S.W.3d at 745–46. We therefore disagree with Briones's assertion that we may not affirm her conviction unless the evidence showed O.B.'s death was directly caused by the use of a deadly weapon. *See Hilla*, 832 S.W.2d at 779.

B.      The State was not required to exclude every reasonable alternative hypothesis.

Briones also argues that because the evidence in this case was circumstantial, the State was required to show the circumstances excluded every reasonable hypothesis other than her guilt. The Texas Court of Criminal Appeals abolished this reasonable hypothesis analytical construct in 1991 because it "effectively places the reviewing court in the posture of a thirteenth juror." *Geesa v. State*, 820 S.W.2d 154, 159–61 (Tex. Crim. App. 1991) *overruled in part on other grounds by Paulson v. State*, 28 S.W.3d 570 (Tex. Crim. App. 2000). Briones's argument on this point is therefore "unsupported by the law." *Cantu v. State*, 395 S.W.3d 202, 207–08 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd).

C.      The evidence was sufficient to support the deadly weapon finding and the murder conviction.

As noted above, Briones argues that both the deadly weapon finding and the murder conviction were based on speculation rather than on competent and legally sufficient evidence. "[J]uries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions." *Hooper*, 214 S.W.3d at 15. "Speculation is mere

theorizing or guessing about the possible meaning of facts and evidence presented. A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt." *Id.* at 16. In contrast, reasonable inferences "reached by considering other facts and deducing a logical consequence from them" can be sufficient to support a conviction. *Id.* at 16–17. "Under the *Jackson* test, we permit juries to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial." *Id.* at 15.

Here, it is undisputed that Briones was O.B.'s only caregiver. Briones testified that on the morning of O.B.'s admission to the hospital, she checked on O.B., saw that she "still appeared to be asleep," and then left the apartment to walk to a gas station around 10:30 a.m. Briones testified that it took "maybe six to eight minutes total" to walk to and from the gas station, and a police officer testified that surveillance video showed she was inside the gas station for eight minutes. Briones testified that O.B. appeared to be fine when she left and was still in bed and "seemed to be asleep" when she returned. Shortly after Briones returned, she heard O.B. coughing and vomiting. At that point, she noticed the bruise on O.B.'s nose and "couldn't tell" if O.B. was conscious, so she "decided that [she] should take her to get checked somewhere."

The evidence showed O.B. arrived at the hospital unconscious, with multiple external injuries—both new and in various stages of healing—and a severe brain injury that Briones could not explain. The jury heard Briones describe—either during her trial testimony or in her videotaped interrogations by police, which were played for the jury in their entirety—multiple instances when she dropped objects such as a laptop and a plate on O.B.'s head, bumped her head into door frames while carrying her or dancing with her, and shut her arms in doors. She described another incident where she pushed O.B. into a bathroom, which caused O.B. to fall face-first onto the edge of a bathtub and chip her front teeth. She also stated that O.B. sometimes injured herself by falling into

walls, furniture, benches, and other objects, falling from a chair onto the floor, dropping a glass container on her own head, scratching her scalp with metal barrettes, and hitting herself in the face with toys. Briones testified these incidents were accidental, that she never hit O.B. with a metal bracket that was found in her apartment and admitted into evidence,[3] and that she did not know what caused the brain injury that ultimately killed O.B. Briones also testified that she used to pinch O.B.'s ears as a disciplinary measure, but stopped because it was not effective.

Dr. Daniel Gebhard, a physician in the pediatric intensive care unit of University Hospital, testified that he examined O.B. "head to toe. . . . and documented everything that [he] could." He told the jury that O.B. had suffered a subdural hematoma[4] and may have suffered a diffuse axonal injury.[5] She had "several" injuries to other parts of her body, including a bruise on her nose that "looked kind of fresh," injuries to both ears, "deformed upper arms bilaterally," "swelling down her arms," diffuse bruising, and "scratches all over her hands." She had "a small hemorrhage in her left eye," which Gebhard described as unusual in a four-year-old. He stated that a retinal hemorrhage like O.B.'s "fit the picture of a severe traumatic injury" and would "require[] a lot more force than what you typically would see in, like, football injuries." Gebhard also reviewed O.B.'s CT scans, and he testified they showed that her brainstem had become "very, very compressed and swollen." He testified that the swelling in her head prevented blood from flowing to her brain "and her brain died because of that." Based on the condition of O.B.'s brain, he opined that she had suffered a stroke at least six to eight hours before the CT scan was performed at 1:23

---

[3] Briones testified that the metal bracket came from a moving box. The metal bracket itself was admitted into evidence as State's Exhibit 42, and photographs of the bracket that were also admitted into evidence showed it to be approximately twenty-four inches long.

[4] A physician who testified at trial described a subdural hematoma as "pockets filled with blood on the back of the head . . . underneath the skin but above the surface of the skull."

[5] Gebhard described diffuse axonal injury (DAI) as "when you shear off a lot of . . . the nerves in the brain," and he explained that it is "something that happens . . . with rotational injuries." Gebhard testified, however, that "you have to have an MRI to diagnose" a diffuse axonal injury, and he explained that MRIs are usually impractical in an emergency situation because they "can take hours to do."

p.m. on September 5, 2017—i.e., before Briones went to the gas station at 10:30 a.m. Gebhard testified that the injuries he saw in O.B.'s brain could have been caused by a strike to the head.

Dr. Bradley Norat, a child abuse pediatrician who examined O.B., testified that he believed her condition showed "substantial evidence of physical abuse." He explained, for example, that her ear injuries and abdominal bruise were concerning because "it's very hard to cause ear injuries accidentally" and "even a small bruise to the abdomen indicates a pretty significant impact." He further testified that O.B.'s fatal brain injuries required "some very forceful impact to the face and head" and could have been caused by being struck by or against objects like a door frame or the metal bracket that was admitted into evidence. He did not believe O.B.'s fatal injuries were something she could have done to herself or that could have been caused by another person accidentally hitting her. He also opined that O.B. could not have sustained her fatal injuries by falling down the stairs, and he explained the factual basis for that opinion. He added that "it would be very uncommon for a [fall] to cause a fatal subdural hematoma in children." The evidence admitted at trial included a report signed by Norat and his supervisor, Dr. James Lukefahr, which concluded:

> Given [O.B.'s] mental status and the appearance of the subdural hematoma, she likely sustained a severe blow to the head. In my professional opinion, based on the medical findings and limited available history, there is a high likelihood [O.B.] has been the victim of life-threatening physical abuse in the form of abusive blunt-force head trauma.

Norat further testified that O.B. did not have any underlying conditions that would have contributed to the state she was in when she arrived at the hospital.

Dr. James Feig, the Bexar County deputy medical examiner who performed O.B.'s autopsy, testified that the bruise on O.B.'s nose was consistent with something striking her in the face. He noted that her frenulum, "which is a little band of soft tissue that joins the gum to the inner surface of the lip," was torn, and he testified that "there has to be some sort of impact to

make that happen." He counted "ten or so" scars on the right side of her scalp and saw more scars on the left side, "although not as many." He explained that at least one of the abrasions on her scalp was recent, and he opined that the scars could have been caused by the metal bracket. During Feig's testimony, the State published State's Exhibit 145, an autopsy photograph that showed the metal bracket held next to two of the scars on O.B.'s scalp. Feig agreed the photograph showed the metal bracket was "certainly consistent with" the size and shape of those scars.[6] He also explained to the jury why it is dangerous to strike a child in the head either with or against an object and how those types of forces affect the brain.

Feig testified that in addition to the external scarring on her scalp, O.B. had internal scarring and injuries in her head. He explained that the subgaleal layer, which he described as "a soft tissue layer" between the skin and the outer surface of the skull, "is usually a very thin layer." But O.B.'s subgaleal layer was "very thick" and "comprised of fibrotic tissue." Feig testified that the fibrosis he saw in O.B's head "is similar to the outside scarring of the skin" and "is the result of healing of some sort of prior injury." He told the jury that O.B.'s subgaleal layer was "the thickest [he had] ever seen[.]" He also discussed his findings that O.B. had suffered a subdural hematoma and a "deep scalp hemorrhage," both of which he described as resulting from "an impact trauma" that involved more force than a typical household accident. Feig concluded that O.B. "died as a result of complications of closed head injuries with a manner of death of homicide." He told the jury:

> [T]his case seems complicated because there are so many injuries. But a lot of the injuries are sort of minor, and they're older. The thing that is the sort of kicker for me is, again, the subdural hematoma, which led to her death. So even if we took

---

[6] As Briones notes in her brief, she later elicited testimony from Feig that he "can't get [the bracket] to match" the scars. However, the record appears to show that testimony was based on an in-court comparison between the metal bracket and a different autopsy photograph of O.B.'s scars, State's Exhibit 136. Unlike State's Exhibit 145, the metal bracket itself is not pictured in State's Exhibit 136. To the extent that Feig's testimony about State's Exhibit 136 conflicted with what the jury saw in State's Exhibit 145, the jury had the authority to resolve that conflict. *See McPherson v. State*, 677 S.W.3d 663, 664 (Tex. Crim. App. 2023) (noting factfinder's responsibility "'to resolve conflicts in the testimony [and] to weigh the evidence'") (quoting *Jackson*, 443 U.S. at 319).

away the scars and the subgaleal thickening and even the old fracture site, we would still be left with a homicide.

He also testified that both the bruise on O.B.'s face and the subdural hematoma were "fresh, meaning recent," but he could not tell if they were "from the same incident."

In addition to the medical testimony described above, the State presented testimony from three neighbors of Briones and O.B. Their next-door neighbor, Zaie Amana, testified that he heard sounds of "[a] crying baby" coming from their apartment at four or five o'clock in the morning "a lot. Like—I'll say like every day or every couple of days." Karen and Nathan Martin, who lived in the apartment directly below Briones and O.B., both testified that they heard "[l]oud banging" and the sound of a crying child coming from upstairs. Karen testified that the sounds she heard were "repetitive noise, bang noise. Like a one, two, three[.]" She testified that her daughter, who lived with her at that time, expressed concerns about the welfare of the child they heard crying. Nathan testified that he heard "a tapping noise repeatedly against the floor. And it bugged me because it wouldn't stop, so I recorded it[.]" He added that he recorded the sounds because "this was happening a lot[.]" Nathan's recording, which was admitted into evidence and played for the jury, is consistent with the sounds he described in his testimony.

As noted above, a few hours before O.B. became unresponsive, she was alone in the apartment for a short time while Briones went to the gas station. Because the apartment was located on the third floor, Briones's attorney theorized at trial that O.B. may have fallen down the stairs while Briones was away and that such a fall could have caused her fatal injuries. On cross-examination, Feig agreed that O.B.'s fatal injuries "could be consistent" with a fall down the concrete stairs that led to the apartment. Briones's medical expert, Dr. William Anderson, who reviewed "the autopsy records, the photos, microscopic sections" and medical records from O.B.'s

final admission to the hospital, testified that he believed O.B.'s fatal brain injury "would be consistent with" a fall down the stairs that morning.

Anderson also testified that he did not believe O.B.'s fatal subdural hematoma supported a finding of homicide or that her injuries showed she had been abused. As support for his testimony that O.B.'s fatal injuries were not caused by physical abuse, Anderson told the jury that he believed O.B.'s torn frenulum was iatrogenic, or physician-caused, rather than the result of a blow to the face. He noted, for example, that the medical records from O.B.'s initial arrival at University Hospital showed the admitting physicians described her mouth as "atraumatic, which means they looked at the mouth, and there was no trauma." After he concluded the frenulum tear was iatrogenic, Anderson "didn't see any injuries on the face" to support a conclusion that O.B. was hit hard enough to accelerate her into a wall.

On cross-examination, the State pointed out that Anderson's own report stated: "The most probable scenario, in my opinion, was the child was slapped with enough force to be knocked down or against some object[.]" Anderson responded, "The most likely, yes. Pathologist is going to come up with the most likely scenario." He acknowledged that he "was very suspicious of child abuse initially in this case," and he testified he "was very concerned that that was the most likely cause. And that's why it was necessary to go through the whole process of ruling that out." He added that he had "[p]retty much" ruled out a conclusion that O.B. died due to an intentional blow that knocked her into a wall:

> [W]e see the impact injury. That still could have been thrown against the wall. But as far as a slap goes, I would say—the major reason I thought it might be the slap most likely was because of the lip [frenulum] injury. And so—but reviewing the records, I see that that obviously was an artifact [*sic*]. So basically, I'm backing off that opinion. But I'm still saying it's still suspicious.

Anderson concluded, "I'm still suspicious [of child abuse], but I'm less suspicious. It's certainly [*sic*] that the terminal event is not an abuse case." He also testified that he did not believe O.B.

suffered a diffuse axonal injury and that Feig did not perform a test necessary to confirm such an injury. He testified that the lack of a diffuse axonal injury would be significant because "to get DAI you have to have a lot of trauma."

On rebuttal, Dr. Kimberly Molina, the chief medical examiner at the Bexar County Medical Examiner's Office, testified that she had reviewed and signed off on Feig's report of his findings from O.B.'s autopsy. She testified that the bruising on O.B.'s nose was "consistent with direct injury to this area, either being struck with or against an object." She described Anderson's testimony about diffuse axonal injury as "somewhat confusing," and she explained why she believed the test Anderson described would not have yielded any helpful information about O.B.'s fatal brain injury. She further testified that the opinions Anderson expressed at trial were inconsistent with both his own report and the findings made by physicians who had personally examined O.B.

Molina described O.B.'s "pattern of injuries" as "inconsistent with having been caused by a fall down the stairs." She noted, for example, that O.B. did not have any scrapes or scratches on her face, elbows, or knees, which she explained one would expect to see after a fall down the stairs. She also explained:

> [I]f we think of a fall down the stairs, we might think that this is a very high fall, depending on how many stairs there are. But in reality, this is a series of short falls. It's one short fall after another. So these short falls do not usually cause significant injuries like subdural hematomas. Could you break an arm? Could you, you know, get scratches from it, bruised from it? Maybe. But not a subdural hematoma.

Like Feig, Molina testified that the cause of O.B.'s death was "closed head injuries" and that the manner of her death was homicide.

Molina also disagreed with Anderson's conclusion that the torn frenulum was iatrogenic, testifying that she "did not see him explaining this laceration in a reasonable way." She noted the autopsy report described that injury as a healing wound, which "means that it happened sometime

prior to when the child was in the hospital." She also testified that due to the location of the injury, she would not be concerned if the admitting physicians did not notice it because "[y]ou really have to pull the lip [up and out] to fully appreciate this laceration." Because Anderson himself testified that his opinion about the frenulum tear was crucial to his conclusion that O.B.'s fatal injuries were not caused by physical abuse, the jury could have rationally concluded that Molina's disagreement with him on this point was significant. *See McPherson*, 677 S.W.3d at 664.

Lukefahr—who, like Norat, was a child abuse pediatrician who examined O.B. before she died—testified on rebuttal that O.B.'s "injuries were obviously very severe and very widespread. And they really were not, in our opinion, consistent with accidental injury but provided substantial evidence . . . that her injuries were inflicted, were caused by another person." Lukefahr added, "this concern that she'd been injured by another person was really heightened by the other injuries that she had . . . the other head injuries that she had, the big bruise on her abdomen, the findings on her arms and the other visible injuries that we could see." Like Molina, Lukefahr told the jury that he believed it was "very unlikely that [O.B.'s subdural hematoma] was from a fall down the stairs" because for children O.B.'s age, "a fall down the stairs is a series of short falls" that typically cause "very minor injuries" other than "the occasional broken arm."

Finally, as noted above, Briones testified O.B. was asleep in bed when she left for the gas station and was still asleep in bed when she returned. She also testified that O.B. "[u]sually" would not move from the place Briones left her. This evidence is consistent with Briones's statements to police officers that "when she put [O.B.] someplace, [O.B.] would stay there until [Briones] returned." Additionally, Anderson's testimony that O.B.'s death could have resulted from a fall down the stairs while Briones was away directly conflicted with Gebhard's testimony that the fatal injury occurred at least six to eight hours before O.B.'s CT scans. Based on this evidence, a rational jury could have rejected the theory that O.B. might have left the apartment and fallen down the

stairs during Briones's trip to the gas station. *See Jackson*, 443 U.S. at 318–19; *Witcher v. State*, 638 S.W.3d 707, 709–10 (Tex. Crim. App. 2022).

In summary, the jury heard evidence that: (1) O.B.'s body showed signs she had been physically abused by another person, including signs that she had been hit in the head and face; (2) her death was caused by a brain injury that was consistent with being struck by or against an object; (3) her fatal injuries were unlikely to have been caused by a fall or other accident; (4) at least some of the marks on her head appeared to match the metal bracket; and (5) her fatal and non-fatal injuries occurred while Briones was her sole caregiver. While the jury also heard conflicting evidence, it did not act irrationally by resolving those conflicts in favor of conviction. *See Jackson*, 443 U.S. at 319; *Nisbett*, 552 S.W.3d at 262. When viewed in the light most favorable to the verdict, as the standard of review requires us to do, the cumulative force of the incriminating evidence presented in this case would allow a rational jury to find beyond a reasonable doubt that Briones intentionally or knowingly "struck [O.B.'s] head with or against" an object "with such force as to cause fatal brain trauma" and that those actions were clearly dangerous to human life. *See Stanul*, 870 S.W.2d at 335; *see also Hooper*, 214 S.W.3d at 13; TEX. PENAL CODE §§ 19.02(b)(3), 22.04(a), (c).

Moreover, the evidence would permit a rational jury to find beyond a reasonable doubt that Briones used a wall, a door frame, the metal bracket, or an unknown object during the commission of the offense and that those objects were "capable of causing death or serious bodily injury." TEX. PENAL CODE § 1.07(a)(17)(B); *Mixon*, 781 S.W.2d at 346. While it is true the evidence did not pinpoint a single object as the deadly weapon at issue, the State was not required to identify a specific deadly weapon where, as here, it presented evidence of the manner in which the weapon was used. *See Mixon*, 781 S.W.2d at 346; *Stanul*, 870 S.W.2d at 334–35.

For these reasons, we conclude the evidence supported both the murder conviction and the deadly weapon finding. *See Jackson*, 443 U.S. at 319. We overrule Briones's first two issues.

### Signed Punishment Form

In her third issue, Briones argues the trial court erred by entering a judgment because the record does not contain a punishment verdict form signed by the jury. It is true that the clerk's record that was before this court when Briones filed her appellate brief did not contain a signed punishment verdict form. However, after Briones filed her brief, the district clerk filed a supplemental clerk's record containing the missing form, and Briones has not challenged the authenticity or adequacy of that form.

We therefore overrule Briones's third issue.

### Publication of Interrogation Videos

In her fourth issue, Briones argues the trial court erred by allowing the State to publish excerpts from four videotaped police interrogations that occurred during the investigation into O.B.'s death. Briones does not dispute the admissibility of these videos or claim that any portion of the videos was improperly excluded from the jury's consideration. Instead, relying on Texas Rules of Evidence 106 and 107, she argues that because the videos were not published in full when the State first introduced them, the jury was left "for an extended time . . . with the false impression that [Briones] was uncaring, unfeeling, and calm" after O.B.'s injury and death.

#### Standard of Review and Applicable Law

Texas Rule of Evidence 106 provides, "If a party introduces all or part of a writing or recorded statement, an adverse party may introduce, at that time, any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." TEX. R. EVID. 106. Texas Rule of Evidence 107 provides:

> If a party introduces part of an act, declaration, conversation, writing, or recorded statement, an adverse party may inquire into any other part on the same subject. An adverse party may also introduce any other act, declaration, conversation, writing, or recorded statement that is necessary to explain or allow the trier of fact to fully understand the part offered by the opponent.

TEX. R. EVID. 107. Rule 107 goes to the admissibility of a particular piece of evidence, and Rule 106 goes to "the timing of its introduction." *Ziolkowski v. State*, 223 S.W.3d 640, 649 n.8 (Tex. App.—Texarkana 2007, pet. ref'd).

We review a trial court's evidentiary rulings for abuse of discretion. *See Morris v. State*, 123 S.W.3d 425, 426 (Tex. App.—San Antonio 2003, pet. ref'd). A trial court does not abuse its discretion if its ruling falls within the zone of reasonable disagreement. *Id.* at 427.

*Application*

In her briefing on this issue, Briones focuses on four video exhibits the State presented at trial:

- State's Exhibit 4, which showed SAPD Detective Raul Juarez questioning Briones on the afternoon of September 5, 2017, while O.B. was still undergoing treatment at the hospital;

- State's Exhibit 113, which showed SAPD Sergeant Rachel Barnes questioning Briones on September 5, 2017, immediately after Juarez's interrogation;

- State's Exhibit 154, which showed Barnes questioning Briones on September 12, 2017, after O.B. died but before Briones was arrested; and

- State's Exhibit 155, which showed Barnes questioning Briones on September 22, 2017, after she was arrested.

State's Exhibits 4 and 154 are each approximately four hours and thirty minutes long, State's Exhibit 113 is approximately forty minutes, and State's Exhibit 155 is approximately one hour and twenty minutes. In State's Exhibits 4, 113, and 154, there are times when Briones appears calm and other times when she appears more emotional. In State's Exhibit 155, she is crying throughout much of the video.

As a threshold matter, we note that while Briones's brief lists State's Exhibit 113 among the videos in question, the record shows she did not raise any Rule 106 or Rule 107 complaints about State's Exhibit 113 below. TEX. R. APP. P. 33.1(a). Additionally, during her cross-examination of Barnes, Briones represented to the trial court "that the first [Barnes] video which was September 5th [i.e., State's Exhibit 113], the State did play that one in its entirety. We went back through the record and made sure of that. So we're not going to be playing that video." To the extent that Briones now wishes to challenge the publication of State's Exhibit 113, we conclude she has not preserved that issue for our review. *Id.*

Briones argued below that the trial court should have prohibited the State from playing only certain portions of State's Exhibit 4, 154, and 155 during its direct examinations of Juarez and Barnes. She argued that under Rules 106 and 107, "[i]f they play part of the video, then we're entitled to ask that at that time—not later, not during our cross-examin[ation]—but at that same time that they have to play the entire thing." Each time Briones raised this objection during the State's initial publication of State's Exhibits 4, 154, and 155, the trial court overruled the objection and noted the exhibit had been admitted in its entirety.

In determining whether the trial court abused its discretion in connection with the publication of State's Exhibits 4, 154, and 155, we first consider Briones's arguments under Rule 107. Texas Rule of Evidence 107 is a rule of admissibility which "permits the introduction *of otherwise inadmissible evidence* when that evidence is necessary to fully and fairly explain a matter 'opened up' by the adverse party." *Walters v. State*, 247 S.W.3d 204, 218 (Tex. Crim. App. 2007) (emphasis added); TEX. R. EVID. 107. Here, the trial court did not exclude any portion of the videos as inadmissible. Its ruling went to the manner in which the parties played the videos for the jury, not to their admissibility. *See Ziolkowski*, 223 S.W.3d at 649 n.8; *cf. Walters*, 247 S.W.3d at 218 ("Rule 107 does not permit the introduction of other similar, but inadmissible, evidence

unless it is necessary to explain properly admitted evidence."). Accordingly, we find no Rule 107 error.

While Rule 107 is a rule of admissibility, Rule 106 primarily focuses on timing. *See Ziolkowski*, 223 S.W.3d at 649 n.8; *Thai v. State*, No. 05-06-00206-CR, 2007 WL 2193309, at *6 (Tex. App.—Dallas Aug. 1, 2007, no pet.) (mem. op., not designated for publication). "Under Rule 106, a party whose opponent introduces part of a writing or recorded statement may at that time introduce 'any other part.' Not only may the adverse party immediately offer the remainder, he may interrupt his opponent's case to do so[.]" *Reece v. State*, 772 S.W.2d 198, 203 (Tex. App.— Houston [14th Dist.] 1989, no pet.) (emphasis omitted); TEX. R. EVID. 106.

One of our sister courts has concluded that the word "introduced," as used in Rule 106, "can mean only 'introduced into evidence' as in Rule 107." *Thai*, 2007 WL 2193309, at *7; *see also Elmore v. State*, 116 S.W.3d 801, 807–09 (Tex. App.—Fort Worth 2003, pet. ref'd) (holding trial court erred by excluding evidence that should have been admitted under Rules 106 and 107). But this case does not present a situation in which the State introduced only part of the videos into evidence and, at the same time, Briones unsuccessfully attempted to introduce the remainder. As noted above, the State introduced the complete version of each video during its direct examinations of Juarez and Barnes, and the trial court admitted each of the videos in their entirety when the State introduced them. While the record shows the State did not immediately publish each admitted video in full, Briones cites no authority holding that Rule 106 required the videos' full publication during the State's direct examinations of Juarez and Barnes, and we have found none.

Even if we assume Rule 106 applies to the publication of evidence as well as its initial introduction, that rule applies to evidence "that in fairness ought to be considered at the same time" as other evidence presented by the opposing party. TEX. R. EVID. 106. As with any evidentiary question, a trial court considering the application of Rule 106 must also heed its duty to "exercise

reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment." TEX. R. EVID. 611(a); *see also Dang v. State*, 154 S.W.3d 616, 619 (Tex. Crim. App. 2005) ("[T]rial courts have broad discretion in managing the course of a trial generally."). Here, the evidence that Briones argued "ought to be considered at the same time" was the full extent of her emotional state during her interrogations by Juarez and Barnes. Having already admitted the videos in their entirety, the trial court was in the best position to appreciate the impact of Briones's full development of evidence about her emotional state—whether during the State's direct examination of the officers, or during Briones's cross-examination of those officers. The trial court could have reasonably concluded that Briones would have a fair opportunity to show her emotional reactions to the jury, even if she was not able to make that showing during the State's direct examinations of the officers. In light of the trial court's broad discretion to exercise reasonable control over the mode and order of examining witnesses and presenting evidence, we cannot conclude that it acted outside the zone of reasonable disagreement by overruling Briones's Rule 106 and 107 complaints. *See Walters*, 247 S.W.3d at 217.

We therefore overrule Briones's fourth issue.

### *Character Evidence*

In her final issue, Briones argues the trial court abused its discretion by excluding witness testimony about her character.

### *Standard of Review and Applicable Law*

Evidence showing that a person acted in conformity with a specific trait generally is not admissible. TEX. R. EVID. 404(a)(1); *Harrison v. State*, 241 S.W.3d 23, 25 (Tex. Crim. App. 2007). However, in a criminal case, a defendant may "introduce evidence of a specific good character

trait to show that it is improbable that [she] committed the offense charged, where that character trait is relevant to the offense." *Valdez v. State*, 2 S.W.3d 518, 519 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd); TEX. R. EVID. 404(a)(2). "When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion." TEX. R. EVID. 405(a)(1). "True character, in the context of Rule 405, means a generalized description of a person's disposition, or of the disposition in respect to a general trait, such as honesty, temperance or peacefulness." *Wheeler v. State*, 67 S.W.3d 879, 882 n.2 (Tex. Crim. App. 2002) (internal quotation marks omitted).

As explained above, we review a trial court's evidentiary rulings for abuse of discretion. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016).

*Application*

During her case-in-chief, Briones asked defense witness Tara Whittle if she was aware "that the State has alleged that [Briones] would beat [O.B.] with" an unidentified object. After Whittle indicated she was aware of that allegation, Briones asked, "Do you have an opinion about whether she would be capable of doing anything like that?" The State objected, and the trial court sustained the objection. Briones subsequently asked Whittle variations of the same question, including "Do you have an opinion about whether . . . [Briones] would be capable of beating [O.B.'s] head against a wall?" and "[D]o you have an opinion about [Briones's] character for beating . . . a child with a rod?" The State objected on the basis that Briones was "not asking about character traits," and the trial court sustained the State's objection.[7]

The questions Briones argues she should have been allowed to ask Whittle are similar to those the Fourteenth Court of Appeals rejected in *Valdez v. State*. In *Valdez*, the appellant—who

---

[7] The trial court later permitted Briones to make an offer of proof outside the jury's presence regarding these questions.

was challenging his conviction for aggravated sexual assault of a child—argued the trial court erred by refusing to allow him to ask witnesses whether he "enjoyed a good reputation in the community for being a 'non-pedophile' and having no sexual preference for young children." 2 S.W.3d at 519. In overruling this complaint, the *Valdez* court explained that the defense's questions "did not seek to establish evidence of a specific good character trait, rather, the defense sought to show that the accused was not known to have committed the type of crime for which he was charged in the past." *Id.* at 520. The court held that framing a question "in terms of an accused's *reputation* for not having committed a specific act" does not transform an improper conduct-based inquiry into a proper one. *Id.* at 521.

We find the *Valdez* court's analysis instructive here. "In a murder case, the accused's reputation for peacefulness, or non-aggressive behavior, is the appropriate inquiry." *Id.* at 520; *see also Wheeler*, 67 S.W.3d at 882 n.2. When Briones asked Whittle about Briones's character traits for peacefulness, patience, and non-violence, the trial court permitted Whittle to answer those questions. However, when Briones reframed those questions in terms of her capability to commit specific acts, the trial court did not abuse its discretion by concluding those inquires went beyond the boundary of proper character evidence. *See Valdez*, 2 S.W.3d at 519–21; *see also Reighley v. State*, 585 S.W.3d 98, 104–05 (Tex. App.—Amarillo 2019, pet. ref'd) (holding, based on *Valdez* and other cases, that trial court did not abuse its discretion by excluding testimony about whether appellant "exhibit[ed] the 'traits of being a pedophile,'" whether witness had seen appellant behave inappropriately around children, and whether witness would trust appellant around children); *Hernandez v. State*, No. 05-13-00202-CR, 2014 WL 50544, at *3 (Tex. App.—Dallas Jan. 7, 2014, no pet.) (mem. op., not designated for publication) ("[T]he status of being a murderer . . . is not a character trait.").

Even if we were to assume the trial court erred by sustaining the State's objections, Briones has not shown the ruling affected her substantial rights. *See* Tex. R. App. P. 44.2(b); *Prible v. State*, 175 S.W.3d 724, 737 (Tex. Crim. App. 2005) (applying Rule 44.2(b) to erroneous evidentiary ruling). Whittle testified without objection that she did not believe Briones could lose her temper with a child, adding that she would trust Briones to watch her own child. Additionally, an earlier witness, Denise Erickson, testified without objection that she did not believe Briones was capable of murdering O.B. In light of this testimony, we cannot say that the exclusion of the testimony Briones sought to elicit from Whittle had a substantial effect on the jury's verdict. *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

We therefore overrule Briones's fifth issue.

**CONCLUSION**

We affirm the trial court's judgment.

Beth Watkins, Justice

PUBLISH